557 A.2d 965

**K & K MANAGEMENT, INC. et al.**

v.

**Chul Woo LEE et al.**

No. 145, Sept. Term, 1987.

Court of Appeals of Maryland.

May 16, 1989.

138

M. Albert Figinski (Arnold M. Weiner, Julie C. Janofsky and Melnicove, Kaufman, Weiner, Smouse & Garbis, P.A., all on brief), Baltimore, for appellants.

Oscar S. Gray and Larry S. Gibson (Michael B. Mitchell and Terrance W. Tankard, all on brief), Baltimore, for appellees.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

RODOWSKY, Judge.

Appellants, owners of a motel, contracted with the appellees to operate the motel's restaurant under a profit sharing lease. About two years later it appeared to the appellants that terminating the arrangement would be more efficient than continuing it. Appellants effected termination by locking out the appellees without notice. This strategy for maximizing value failed to consider all of the costs. When the dust settled after the resulting litigation, the appellees held judgments based on jury verdicts totaling $979,400 in compensatory and punitive damages for breach of contract, conversion, and malicious interference with business relationships. Acting through counsel who were not trial counsel, appellants have assigned numerous errors. The principal claim of error with which we agree, and which carries a price tag of $800,000, was permitting the jury to treat the breach of the contract between the parties as a tort.

Appellees, the plaintiffs, are Chul Woo Lee and his wife, So Ja Lee, who in 1970 came to this country with their three daughters from the Republic of Korea. Although both plaintiffs had bachelor's degrees, Mr. Lee initially worked here as a cook and Mrs. Lee was employed as a seamstress. In 1974 they opened a restaurant, the Seoul, in an apartment house on University Parkway in Baltimore City. The business was successful. Its menu of American and native Korean foods drew general patronage from the locality and among Korean–Americans from the greater metropolitan area. The Seoul Restaurant became the place for luncheon and dinner meetings of Korean organizations and for social functions within the Korean community. At the University

Parkway location the Seoul Restaurant did not serve break-fast, had no off-street parking, and had no alcoholic beverage license.

The individual defendants, appellants Robert L. Kirby, Sr. (Robert Sr.) and his two sons, Robert L. Kirby, Jr. (Robert Jr.) and Phillip D. Kirby (Phillip), are in the business of operating motels. Their headquarters is in Northern Virginia. Each of the Kirbys owns one-third of the stock of the corporate defendant, appellant K & K Management, Inc., a Virginia corporation (K & K). K & K owns and operates Harbor City Inn, a 125 room, Baltimore City motel which is franchised as part of the Best Western chain. Harbor City Inn is on Russell Street, just north of I–95 and south of the Camden Industrial Park, in a neighborhood dominated by warehouses, gasoline stations, and a municipal refuse incinerator. Harbor City Inn has a restaurant, the public areas of which are a main dining room, a smaller room for private groups, and a bar. Prior to the contract between the parties to this case, a Maynard Meyers (Meyers) operated the motel restaurant but, by August 1981, he no longer planned to continue operating it.

In K & K's search for a successor to Meyers, Phillip visited the Lees' Seoul Restaurant and opened negotiations. K & K had to have a restaurant, particularly to serve breakfast. The Lees were attracted by off-street parking and by K & K's alcoholic beverage license. The negotiations resulted in a written contract between Mr. and Mrs. Lee and K & K, prepared by K & K, and dated August 12, 1981 (the Agreement).

Under the Agreement K & K granted the Lees the exclusive right to operate, and the Lees agreed to operate, the restaurant at Harbor City Inn for five years beginning August 15, 1981, with the option in the Lees to renew for two successive terms of five years each. K & K had the right to set "the general operating standards for the restaurant" in accordance with standards normally established by Best Western. The Lees agreed, "[s]ubject to the general

control and standards of K & K," to "oversee and control all phases of the restaurant operation...."

For working capital the Lees furnished $20,000. This was deposited into an escrow account which required two signatures, one that of a representative of K & K and the other that of a representative of the Lees. K & K maintained the accounting records of the venture at its headquarters. As a financial control the Agreement called for an operating account, with the same signature requirement, into which all restaurant receipts were to be deposited and from which all restaurant expenditures would be made. In actual operation a third account was also established. Known as the management account, it seems to have been intended initially for cash purchases and it required only the signature of a person designated by the Lees. The amount from receipts to be deposited into the management account was subject to K & K's approval. We shall call both the operating account and the management account the "business accounts."[1] Under the Agreement, the restaurant venture paid no rent to K & K but did pay $500 per month to K & K for utilities.

"If and to the extent that the cash flow of the restaurant operation [did] not cover the expenses thereof, such deficit [was to] be made up by a transfer of funds from the escrow account to the operating account." Any net proceeds which were "not reinvested to upgrade the facility" were to be paid eighty percent to the Lees and twenty percent to K & K. The Lees had the right to decide, at times and in amounts of their choosing, "to reinvest net profits or to withdraw net profits and distribute them[.]" If funds in the business accounts were "insufficient to cover all existing current and accrued expenses," the Lees were to transfer sufficient funds from the escrow account, and, if they failed to do so, K & K had the right immediately to terminate the Agreement.

---

1. The legal effect under the Agreement of the business accounts became an issue in the conversion claim, discussed in Part III B, *infra.*

K & K also had a right to terminate the Agreement on thirty days written notice by certified mail to the Lees if their operation did not meet the standards set, in accordance with the Agreement, by K & K. An option in K & K immediately to terminate was provided under paragraph thirteen, should the Lees "create any ... obligations or liability to K & K[.]" Paragraph three provided that, on termination, "[a]ny and all improvements made by [the Lees] become a part of and shall remain a part of the permanent restaurant facilities and may not be removed" by the Lees. Touching upon the same subject, paragraph seventeen in part stated that "[u]pon termination of this agreement, all improvements made to the property by [the Lees] shall revert to the ownership of K & K."

In addition to the $20,000 which the Lees placed in the escrow account, they also paid $15,000 over a period of time to Meyers, apparently for Meyers's relinquishment of whatever rights he had to continue to operate the restaurant and also for certain equipment left by Meyers.

In August 1981, when the Lees began operations at Harbor City Inn, the restaurant had a rundown appearance and was only skeletally equipped. Utilizing funds from the business accounts, or reimbursing themselves from the business accounts for charges against their personal credit, the Lees had the restaurant painted, replaced the draperies and carpeting, and purchased replacement and additional equipment and utensils for the kitchen and dining areas.

The Kirbys were sufficiently satisfied with the Lees' operation that, around January of 1982, they engaged Mr. Lee additionally to operate the restaurant in a motel which they owned in Falls Church, Virginia. The travel and separation from his family in Baltimore, however, were too taxing on Mr. Lee and the Falls Church arrangement was mutually rescinded.

The Lees had renamed the restaurant at Harbor City Inn the Seoul Restaurant. At that location the Seoul Restaurant continued to be the meeting place for Korean business

and social functions and, due to its proximity to I-95, the restaurant drew Korean patronage not only from Baltimore but from the Washington, D.C. area as well.

The Agreement remained in effect from August 15, 1981, through September 6, 1983, when K & K breached it. During that time Mr. Lee worked twelve to twenty hours per day, seven days a week, without vacation. He received no salary from the business. Mrs. Lee and each of the three daughters worked in the venture, at least part time, for which they were paid wages. Total distributions of "profits" to the Lees over the life of the Agreement were approximately $28,800 and to K & K, $7,300. The $20,000 capitalization was entirely expended in operations and apparently was not reimbursed to the Lees prior to the 80/20 distributions.

What happened to the relationship between the parties was the subject of conflicting testimony consuming the better part of eight trial days. From the evidence most favorable to the plaintiffs the jury could find that the Lees ran a competent operation, that they were very hard working and eager to please, that the complaints voiced by K & K's Virginia management were largely based on information furnished by the K & K manager who was resident at Harbor City Inn, a Richard Dahlseid (Dahlseid), and that Dahlseid meddled in restaurant operations.[2]

Among K & K's complaints about the Lees' operation, as documented in letters to Mr. Lee dated August 19, 1982, and October 29, 1982, were inadequate staffing at breakfast time, lack of fluency in English of those who seated and served customers, and failure to prepare group menus to permit competitive bidding for tour groups at prices combining accommodations and meals. On January 28, 1983, a Best Western inspector ate at the Seoul Restaurant and reported that the "service is terrible." By letter of February 1, 1983, from Phillip to Mr. Lee, K & K gave the Lees

---

2. Dahlseid was named as a defendant in the suit but was never served and did not testify.

"one last opportunity to operate ... at the standards set forth in our agreement." The letter concluded that otherwise K & K would "be forced to start legal proceedings to obtain possession of the restaurant premises."

K & K did not predicate its termination of the Agreement on a failure by the Lees to meet standards. Utilizing the separation from employment at the Seoul Restaurant of a waitress named Kimberley A. Appel (Appel), K & K took the position that the Lees had caused it to incur a liability so that K & K could invoke its option immediately to declare the Agreement null and void. K & K's officers said that they acted on the basis of a copy of a Notice of Benefit Determination mailed August 29, 1983, to the restaurant by the State of Maryland Employment Security Administration. The notice advised that a hearing examiner had found that Appel "was discharged, or suspended as a disciplinary measure by the employer, Seoul Restaurant, on June 19, 1983 because she was pregnant and employer was afraid that if she worked past three months her job may cause complications with her pregnancy." Mr. Lee and his oldest daughter, Kimberly, testified that, in fact, Appel voluntarily resigned. There was no evidence that Appel, who did not testify, ever threatened to make any legal claim. Thus, the jury could conclude that K & K had no basis to repossess the premises without notice, as described below.

In the early hours of the morning of September 7, 1983, after the Seoul Restaurant had closed, Robert Jr. and Phillip, accompanied by K & K's director of operations and by its food and beverage manager, met a locksmith at Harbor City Inn and changed the locks on the exterior doors of the restaurant area of the motel. When Mr. Lee arrived to open for business that morning, Robert Jr. handed him a letter dated the preceding day in which K & K specified the Appel incident as the violation of the Agreement justifying immediate termination.

The K & K representatives permitted Mr. Lee to remove his personal belongings from the restaurant but told him that nothing could be removed which had been purchased

through the business accounts. To effect compliance with that directive, a K & K representative accompanied Mr. Lee through the restaurant premises on that occasion and on one or two subsequent occasions when he returned to remove personalty. Mr. Lee did not at that time challenge the K & K position concerning the ownership of personal property purchased through the business accounts.

There was evidence that Mr. Lee was greatly humiliated by the closing of the Seoul Restaurant, that he became extremely depressed and that his wife feared that he might commit suicide. Within several weeks, however, he determined to fight back and engaged counsel. One hundred ten days after the closing, the Lees opened a cafeteria in the Mondawmin Shopping Center in Baltimore City. Thereafter, they opened a new Seoul Restaurant in Towson, in Baltimore County. Both businesses have been successful.

After terminating the Agreement K & K undertook operating the restaurant at Harbor City Inn. The operation has not been profitable.

The Lees filed suit against the Kirbys and K & K in the Circuit Court for Baltimore City. An amended complaint alleged, among other things, breach of contract (Count I), conversion (Count III), and interference with business (Count VI). These counts eventually went to the jury which found for the Lees on all of them. The verdict sheet reveals jury findings that K & K breached its contract with the Lees, producing compensatory damages of $93,000; that K & K converted property of the Lees, resulting in compensatory damages of $14,400 and punitive damages against K & K of $72,000; and that K & K and the Kirbys interfered with the business of the Lees. The last finding gave rise to an award of $200,000 compensatory damages against K & K and the Kirbys, plus $500,000 punitive damages against Robert Sr., and $50,000 punitive damages against each of Phillip and Robert Jr. The trial court entered judgment, accordingly, in the aggregate amount of $979,400.

The Kirbys and K & K appealed the judgment to the Court of Special Appeals. We granted certiorari on our own motion prior to resolution by the Court of Special Appeals.

Appellants have raised a number of issues and appellees have questioned whether most of them have been preserved for appellate review. Because our decision obviates the need to discuss some of these issues, we address only the following questions:

I. As to the contract claim:

A. If preserved, did the trial court err in allowing the jury to award damages in excess of those reasonably suffered during the thirty day notice period contained in the Agreement?

B. Did the trial court abuse its discretion by permitting a judge of the Orphans' Court of Baltimore City to testify as an expert witness on damages?

II. As to the malicious interference claim:

A. Did the appellants preserve their contention of error as set forth in issue II B below?

B. Did the trial court err in allowing the jury to consider the tort of malicious interference with business for an act which, at most, was simply a breach of the Agreement?

III. As to the conversion claim:

A. Did K & K preserve for appellate review its claims of error set forth in issue III B below?

B. Did the trial court err in allowing judgments to be entered for compensatory and punitive damages for conversion because the elements of conversion had not been established and there was no evidence to support the award of punitive damages?

# I

With respect to breach of contract K & K does not question the sufficiency of the evidence of breach by K & K and of damages of $93,000 to the Lees, measured through

the second renewal of the Agreement. But, K & K does contest the breach of contract award on the following grounds.

## A

K & K's primary position on the breach of contract claim was that, through the Appel incident, the Lees had created a liability for K & K which permitted immediate termination. In the event the jury disagreed, K & K's next line of defense on the contract claim was that the Lees had failed to meet standards so that K & K's only breach would be its failure to have given the Lees thirty days notice of termination. Accordingly K & K requested an instruction which in part read:

"If you find that the Lees failed to operate the restaurant facilities in accordance with the standards set forth by K & K or that the Lees breached any other terms and conditions of this [A]greement, then the Lees are limited to damages for a thirty day period beginning September 6, 1983."

That requested instruction was denied.

We shall assume that K & K preserved this issue for review. We shall also assume that the trial court erred by not including, more explicitly than it did, this theory of defense in its instructions. Nevertheless, the assumed error is not prejudicial. The trial court did instruct, in part, on the contract claim:

"In order for the Plaintiffs to recover damages for breach of contract they must prove that the Defendant[ ] breached the contract and that the Plaintiffs did not themselves commit a material breach of that contract. A breach is material if it affects the purpose of a contract in an important or vital way. A material breach by one party to a contract relieves the other party of its obligations to perform under that contract."

Under that instruction the jury could not have found, as it did, that K & K breached the Agreement if the jury also

found that the Lees had materially breached the Agreement by failing to meet standards, or for some other reason justifying termination on thirty days notice. Phrased another way, the jury necessarily found that the Lees had not materially breached the Agreement. Because a breach by the Lees was essential to the partial defense embodied in K & K's requested instruction, K & K was not prejudiced by the failure to so instruct.

## B

K & K's next issue relates to the testimony of David B. Allen. Allen, a lawyer, a certified public accountant, and a former college accounting instructor, gave expert testimony on behalf of the Lees. He presented projections of future lost profits and lost goodwill as a measurement of compensatory damages applicable to the breach of contract claim. K & K questioned his qualifications as an expert and objected to certain limitations on cross-examination imposed by the trial judge. But the major objection relied on here, and admittedly preserved below, was based on the fact that Allen was, at time of trial, a judge of the Orphans' Court of Baltimore City.[3]

According to K & K, this fact should have prevented Allen's testimony because Canon 2 B of the Maryland Code of Judicial Conduct (Md.Rule 1231) provides, in pertinent part, that "[a] judge should not use the prestige of judicial office to advance the private interests of others" and because Canon 2 A exhorts "[a] judge [to] behave with propriety and [to] avoid even the appearance of impropriety."[4]

We acknowledge the importance of ethical conduct on the part of judges, and we recognize that judges of

---

**3.** The Lees retained Allen as an expert witness approximately one year before he became a judge.

**4.** When this case was tried, former Md. Rule 1231 and the former Canons and Rules of Judicial Ethics were in effect. Since the relevant current provisions do not differ from the former ones in any substantive way, we refer to the current ones.

orphans' courts are subject to the Code of Judicial Conduct. Canon 6 A. We observe, however, that its provisions are directed to the judges whom it governs; the Canons are not, in general, intended to be rules of evidence. "[T]he major purpose of judicial discipline is . . . to protect the public and, thus, preserve the integrity of the judicial process, maintain public confidence in the judiciary, and create a greater awareness of proper judicial behavior on the part of judges themselves." National Center for Professional Responsibility, Am. Bar Assoc., *Professional Discipline for Lawyers and Judges* 14 (1979). The American Bar Associations' Model Code of Judicial Conduct, which has been adopted in whole or in part by most states including Maryland,[5] is enforced, absent substantial misconduct from the bench, primarily by means of disciplinary actions with advisory opinions serving as a secondary means of enforcement. C. Wolfram, *Modern Legal Ethics* § 17.3.2 (1986); Thode, *The Code of Judicial Conduct—The First Five Years in the Courts*, 1977 Utah L.Rev. 395, 396 (1977). But even if we assume, without deciding, that a judge's testimony might be excluded because the judge's conduct violates a Canon, we see no error here.

■ The only canonical provision directly relating to judicial testimony is Canon 2 B's statement that "[a] judge should not testify voluntarily as a character witness." That does not apply here. Nor did Allen's testimony even remotely use the prestige of his office to advance the private interests of the Lees. The trial court directed parties and witnesses that the jury not be made aware of Allen's public office, and this order was scrupulously followed. Under this circumstance, because Allen had been retained as an expert before his appointment as an orphans' court judge, and because, so far as the record shows, he appeared only

---

5. Present Rule 1231, which became effective July 1, 1987, is derived in part from the former Maryland Canons and Rules of Judicial Ethics and in part from the ABA Model Code of Judicial Conduct.

as an expert witness in this case, we see no problem either with impropriety or the appearance of impropriety.

In passing, we note that under Md.Code (1957, 1987 Repl.Vol.), Art. 10, § 30, a judge of the Orphans' Court of Baltimore City, "if duly admitted to the practice of law, may act as an attorney or solicitor and appear before any court ... in this State except an orphans' court." *See also* Canon 4 I(1)(b). Surely one who would be allowed to act as counsel for the Lees in this case does not violate the Code of Judicial Conduct by testifying for them as an expert witness on projected damages, when his public office is unrevealed to the fact finders, when he was retained as an expert before he became a judge, and when there is no suggestion that his appearance in court in any way affected his judicial duties.

K & K also claims that the very restriction against disclosing the fact of Allen's judgeship unduly inhibited the ability to cross-examine him. Specifically, it claims that inquiry could not be made into the time Judge Allen devoted to his judicial work, which, according to K & K, had nothing to do with his asserted area of expertise. The argument is meritless. K & K could have developed the same point by inquiring as to how much time Allen devoted to work in the fields of accounting and economic forecasting, and how much experience he had therein. Indeed, the trial judge suggested that counsel pursue this line of inquiry.

Finally, K & K questions, in some measure, Allen's qualifications as an expert. On this issue he was subjected to vigorous cross-examination. Having carefully reviewed the applicable portion of the transcript, the trial court's decision to allow the testimony was well within the discretion allowed a trial judge in this regard. *Impala Platinum v. Impala Sales*, 283 Md. 296, 332, 389 A.2d 887, 908 (1978).

## II

In this part II we address the issues relating to the tort of malicious interference with business, beginning with that of preservation.

A

■ In a motion for summary judgment, in a trial brief, and in extensive oral argument on their motion for judgment at the conclusion of the Lees' case, the appellants submitted that a party whose breach of contract incidentally causes interference with the promisee's business relationships with third parties is not responsible in tort for damages for interference with those business relationships. At the close of all of the evidence the appellants renewed their motion for judgment "[o]n all the same bases," without "tak[ing] the [c]ourt's time to argue further." The trial judge responded: "Sure. They are renewed and denied again." Appellants thereby satisfied Rule 2–519(a)'s requirement that the grounds of a motion for judgment be stated "with particularity." *See Warfield v. State,* 315 Md. 474, 554 A.2d 1238 (1989) ("renewal" under circumstances similar to those now before us held to satisfy the particularity requirement of Rule 4–324(a), the comparable rule for criminal causes). Appellants' motion for judgment notwithstanding the verdict under Rule 2–532 which raised the same grounds was also denied.

■ The appellees' nonpreservation argument rests on the lack of exceptions by the appellants to the trial court's instructions concerning interference with business relationships and on the statement by the defense that it had "no objection" to the special verdict sheet which the trial court furnished to the jury. As to the latter point, it is clear that the defendants did not waive or abandon their position on the merits. "No objection" meant simply that, given the position which the trial court was adopting on the controlling law and which rejected defense counsel's legal arguments, the defense was not requesting any change in the phraseology of the special verdict issues which expressed the legal framework established by the trial court. Further, there was no obligation on defense counsel to except to the instructions as given when the defense position was that, as a matter of law, the tort of malicious interference should not have been submitted to the jury at all. That

position was preserved by appellants' motion for judgment at the close of the evidence. An exception to the court's failure to instruct the jury that the jury must return a verdict for the defendants on the count claiming malicious interference would have been redundant.

## B

The merits concerning the legal sufficiency of appellees' case for malicious interference with business present a question of fundamental legal analysis. Appellants' position accepts as its premise that K & K breached its contract with the Lees for which K & K is responsible for actual damages, including consequential damages. Appellants submit that even the intentional breach of a contract by the promisor cannot give rise to a cause of action in the promisee for malicious interference. Appellants argue that the effect of a breach of the primary contract, including the breach's incidental effects on business relationships of the promisee with third parties to the primary contract, is remedied at law exclusively by the contract damages suffered by the promisee.

Appellees disclaim undermining the rule that a contract breacher generally does not commit a tort by "interfering" with the breacher's own promised performance. The Lees assert that they enjoyed advantageous economic relationships at the time of the restaurant closing with their customers and with their suppliers. The Lees say that K & K. and the Kirbys maliciously interfered with those relationships. Under appellees' analysis, the Kirbys are tortfeasors together with K & K and, as such, the Kirbys are liable in tort along with K & K.

■ Tortious interference with business relationships arises only out of the relationships between three parties, the parties to a contract or other economic relationship (P and T) and the interferer (D). We have said that "the two general types of tort actions for interference with business relationships are inducing the breach of an existing contract

and, more broadly, maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract." *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 69, 485 A.2d 663, 674 (1984). The elements of the form of the tort involving prospective contracts were listed in *Natural Design*.

" ' "(1) [I]ntentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting." ' "

302 Md. at 71, 485 A.2d at 675 (quoting *Willner v. Silverman*, 109 Md. 341, 355, 71 A. 962, 964 (1909), in turn quoting from *Walker v. Cronin*, 107 Mass. 555, 562 (1871)).

Restatement (Second) of Torts (1979) (Restatement), by dividing into two parts the branch of the tort dealing with existing contracts, concludes that the tort may be committed in three ways. In the two Restatement sections dealing with existing contracts, D is subject to liability to P if D "intentionally and improperly interferes with the performance of a contract" between P and T, where P may be either the promisor or promisee of the performance. In the § 766 scenario where P is the promisee, D interferes "by inducing or otherwise causing [T] not to perform the contract. . . ." Under § 766A, where P is the promisor, D commits the tort "by preventing [P] from performing the contract or causing [P's] performance to be more expensive or burdensome. . . ." Section 766B's rule subjects D to liability to P where D "intentionally and improperly interferes with [P's] prospective contractual relation . . . whether the interference consists of

"(a) inducing or otherwise causing [T] not to enter into or continue the prospective relation or

"(b) preventing [P] from acquiring or continuing the prospective relation."

A two party situation is entirely different. If D interferes with D's own contract with P, D does not, on that

ground alone, commit tortious interference, and P's remedy is for breach of the contract between P and D. This Court has "never permitted recovery for the tort of intentional interference with a contract when both the defendant and the plaintiff were parties to the contract." *Wilmington Trust Co. v. Clark*, 289 Md. 313, 329, 424 A.2d 744, 754 (1981). *See also Continental Casualty Co. v. Mirabile*, 52 Md.App. 387, 402, 449 A.2d 1176, 1185, *cert. denied*, 294 Md. 652 (1982). *Wilmington Trust* cited numerous federal and state court decisions in support of its holding that "there is no cause of action for interference with a contract when suit is brought against a party to the contract." 289 Md. at 329, 424 A.2d at 754. *See also* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on The Law of Torts* 990 (5th ed. 1984) ("The defendant's breach of his own contract with the plaintiff is of course not a basis for the tort.").

In this case the Lees seek to skirt the settled rule described above by contending that this is a case of tortious interference by D with business relations between P and T where T is comprised of the customers and suppliers of the Seoul Restaurant at Harbor City Inn. Based on the way in which the Lees tried their case, it is clear that the branch of the tort on which they rely is the broader branch of "maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract." *Natural Design*, 302 Md. at 69, 485 A.2d at 674.

■ With respect to suppliers, there was no evidence of any particular contract with any particular supplier with which the appellants interfered. Even if we assume that the jury could properly infer, for example, that the Lees on the day before the closing had placed an order for fresh produce to be delivered on the day of the closing, the Lees never proved actual damage resulting from the breach of any specific supplier's contract. An element of the tort is actual damage and loss resulting from the interference. *Natural Design*, 302 Md. at 71, 485 A.2d at 675. Although *Natural Design* dealt with interference with noncontractual

relations, malicious interference with an existing contract similarly "is for pecuniary loss resulting from the interference." Restatement § 766, comment *t* and § 766A, comment *i*. Further, the evidence is uncontradicted that the Lees did not suffer any impairment of their ability to obtain credit from suppliers when the Lees went back into the food service business after having been locked out by the appellants.

With respect to customers the evidence most favorable to the Lees is that, at the time of the closing, there were "some advance deposits" in the management account. Indeed, there was a reservation for a party of thirty for the evening of the day on which the Seoul was closed. The organization which made the reservation for that evening was never identified. The only deposit specified in the proof apparently related to a different event. That deposit of $90 was reimbursed by Harbor City Inn to an unidentified man who had produced a receipt. That sum was in turn reimbursed to Harbor City Inn by check dated November 10, 1983, drawn on the restaurant management account, signed by Mr. Lee and Robert Jr., and marked "Adv. Dep on Diehl-Shora [?] Recep." There was also evidence that an organization of Korean women planned to meet at the Seoul the week following the closing and that a Korean medical student association was scheduled to meet there within one month after the closing.

We shall assume that the Lees' arrangements with customers who had made reservations were existing contracts. Nevertheless the Lees did not attempt to prove actual loss resulting from any specific contract. The Lees did, however, show actual loss resulting from their business relations with prospective customers by proving, as part of the consequential damages resulting from breach of the Agreement, the loss of profit to the Lees from general restaurant operations projected over the balance of the life of the Agreement and its two extensions. Thus, the evidence of actual loss relates to the Lees' broad economic relationships and is not premised on interference with one or more

specific contracts.[6]   On the record before us, the Lees' interference claim necessarily is that appellants committed the *Natural Design*—Restatement § 766B variety of the tort.

At oral argument, the Lees emphasized that appellants' interference was intentional, in the tort sense of "intentional."   Under the Restatement, D's preventing P from continuing a prospective relation is intentional if D "desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action." § 766B, comment *d.*   Here the officers of K & K knew that the Seoul Restaurant was a meeting place for Korean organizations.   We shall assume, *arguendo,* that the evidence supports a finding that the closing would be substantially certain to prevent the Lees from honoring arrangements with one or more Korean organizations.

But acts have multiple effects.   D's breach of contract with P can interfere with P's business relations with T. Whether that effect is tortious interference with the P–T relationship depends in large measure on whether D's purpose or motive in breaching the D–P contract is to interfere with the P–T relationship.   The Restatement analysis of the tort distinguishes purpose from intent.   Even if the officers of K & K could be found to have tortious intent based on the assumed substantial certainty of interference with Korean customers, there is no tort because the evidence is uncontradicted that appellants' purpose or motive in closing

---

6.  The Lees' theory of damages is that there is no duplication in the verdicts.   In the language of Restatement § 774A which we approved in *Rite Aid Corp. v. Lake Shore Investors,* 298 Md. 611, 471 A.2d 735 (1984), the recovery for breach of the Agreement represents "the pecuniary loss of the benefits of the contract or the prospective relation" (§ 774A(1)(a)) while the recovery of actual damages on the malicious interference count represents "emotional distress or actual harm to reputation" (§ 774A(1)(c)).   Because we hold that the evidence of the interference tort is insufficient, we do not reach the issue of alleged duplication in recovery which has been raised by appellants.

the restaurant was not directed at the Lees' relations with their customers.

Restatement § 766B requires, in addition to the actor's having a tortious intent, that the conduct be improper, as determined by applying the factors, including motive, set forth in § 767.[7] Motive is described in comment *d* which in part reads:

"Intent alone, however, may not be sufficient to make the interference improper, especially when it is supplied by the actor's knowledge that the interference was a necessary consequence of his conduct rather than by his desire to bring it about. In determining whether the interference is improper, it may become very important to ascertain whether the actor was motivated, in whole or in part, by a desire to interfere with the other's contractual relations. If this was the sole motive the interference is almost certain to be held improper. A motive to injure another or to vent one's ill will on him serves no socially useful purpose.

"The desire to interfere with the other's contractual relations need not, however, be the sole motive. If it is the primary motive it may carry substantial weight in the balancing process and even if it is only a casual motive it may still be significant in some circumstances. On the other hand, if there is no desire at all to accomplish the

---

7. Section 767 reads:
   "In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:
   (a) the nature of the actor's conduct,
   (b) the actor's motive,
   (c) the interests of the other with which the actor's conduct interferes,
   (d) the interests sought to be advanced by the actor,
   (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
   (f) the proximity or remoteness of the actor's conduct to the interference and
   (g) the relations between the parties."

interference and it is brought about only as a necessary consequence of the conduct of the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional, but the factor of motive carries little weight toward producing a determination that the interference was improper.

. . . .

"The relation of the factor of motive to that of the nature of the actor's conduct is an illustration of the interplay between factors in reaching a determination of whether the actor's conduct was improper. If the conduct is independently wrongful—as, for example, if it is illegal because it is in restraint of trade or if it is tortious toward the third person whose conduct is influenced—the desire to interfere with the other's contractual relations may be less essential to a holding that the interference is improper. On the other hand, if the means used by the actor are innocent or less blameworthy, the desire to accomplish the interference may be more essential to a holding that the interference is improper."

Restatement § 767, at 32–33.

Maryland law makes the same distinction. The elements of interference with prospective contracts include "(1) intentional and wilful acts" which are "(3) done with the unlawful purpose to cause such damage and loss. . . ." *Natural Design*, 302 Md. at 71, 485 A.2d at 675.

This is not to say that acts which constitute a breach of contract between P and D can never be the basis of malicious interference by D with business relations between P and T. Unlike appellants' breach of the Agreement, the breach or threatened breach of the P–D contract may be the instrument selected by D for the purpose of interfering with the P–T contract. The point is illustrated by cases on which the Lees rely. In *Sumwalt Ice & Coal Co. v. Knickerbocker Ice Co.*, 114 Md. 403, 80 A. 48 (1911), D, an ice manufacturer, contracted to sell to P, a wholesaler and retailer of ice, all of P's ice requirements at $2.50 per ton. P in turn had a contract to sell and deliver ice to T at $5.00

per ton. D threatened to breach its contract with P by failing to furnish any ice to P unless P terminated its contract with T. P, fearing the total ruin of its business because of the lack of any alternative source of supply due to a shortage of ice throughout the mid-Atlantic states, succumbed to D's duress. P proved that D acted "with the desire and intent . . . to injure [P] and to obtain a benefit for itself by selling [487] tons of ice" to T at $5.00 per ton, undelivered. *Id.* at 412, 80 A. at 49. We reversed the grant of D's motion for judgment, reasoning in part that

> "it was the legal duty of the defendant to refrain from the use of intimidation, force, coercion, threats, or any other illegal means with a view of preventing [P from carrying out its contract with T], and if with the purpose and by the means stated in the declaration [D prevented P] from fulfilling its contract with [T] . . . the defendant's liability for such damage or loss cannot be seriously doubted."

*Id.* at 413–14, 80 A. at 50.[8]

*Winternitz v. Summit Hills Joint Venture,* 73 Md.App. 16, 532 A.2d 1089 (1987), *cert. denied,* 312 Md. 127, 538 A.2d 778 (1988) also illustrates the point. P owned and operated a drug store on premises leased from D in D's shopping center. After P and D's agent had orally agreed on a new lease of the premises, P agreed to sell his business to T, contingent on P's obtaining the new lease in writing. D refused to execute the new lease. When T's realtor sought a lease to T directly from D, D expressed a willingness to do so only if P "walks out with nothing." Thereafter, D entered into a lease with T at a higher rental than that orally agreed upon in the proposed new lease between P and D. Brief of Appellant at 10–11; Joint Record Extract at 347, *Winternitz* (No. 222, Sept. Term, 1987). The Court

---

8. The ultimate purchaser also proved a cause of action against the manufacturer for interference with the promised performance by the wholesaler under the contract between the wholesaler and the ultimate purchaser. *Knickerbocker Ice Co. v. Gardiner Dairy Co.,* 107 Md. 556, 69 A. 405 (1908).

of Special Appeals reinstated judgment on a jury verdict finding malicious interference because D acted with the "intent [*i.e.*, motive] of sabotaging" the P–T contract. 73 Md.App. at 28, 532 A.2d at 1095. The court said that the breach of the contract between P and D was "not for its own sake, to end the contractual relationship between [P and D], but for the deliberate, independent, and successful purpose of interfering with [P's] contract with [T]." *Id.*

Thus, in both *Sumwalt v. Knickerbocker* and *Winternitz*, D threatened to withhold performance or intentionally withheld performance of an existing contract between D and P, thereby preventing P's performance of a prospective contract between P and T, so that D could obtain the benefit of the economic relationship with T. Here, the customers of the Lees at Harbor City Inn are not comparable. The Lees cannot claim that the guests at the motel or the persons working in the neighborhood were their customers whom the appellants sought to appropriate by breaking the lease.[9] The patronage of those classes of customers primarily depended on location, and the Lees' rights to the location depended on the Agreement. Any claim of tortious interference with the Lees' business relations with those customers is indistinguishable from the breach of the Agreement and has been compensated by damages measured by lost profits for the life of the Agreement. The Lees additionally had a personal following of Korean customers and, indeed, tried their case with emphasis on that business relationship. But no reasonable person could conclude on the evidence in this case that the appellants' purpose in closing the Seoul Restaurant was to attempt to obtain for themselves the future business of the Korean customers. The Lees' loss of that business (as it developed, a temporary loss) was an incidental effect of appellants'

---

9. The evidence is that there is not even a fast food restaurant in the locality of Harbor City Inn. There was also evidence that, on one occasion when for some reason the Lees were not able to serve breakfast, the motel had to bus guests to another restaurant, utilizing the Harbor City Inn minibus.

breach of the Agreement and not the object or purpose of the breach.

Absence of the element of purpose to interfere with business relationships is illustrated in *DeVoto v. Pacific Fidelity Life Ins. Co.*, 618 F.2d 1340 (9th Cir.), *cert. denied*, 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980). A mortgage lender (D) had an arrangement with a credit life insurer (T) under which D sold T lists of its borrowers. Insurance brokers (P) had brought D and T together and received a commission on policies written by T on the lives of D's borrowers. A competing credit life insurer, which was a sister corporation of D, obtained D's business. P sued D claiming malicious interference with the P-T relationship and obtained judgment on a jury verdict. The competing life insurer was also joined as a defendant but the court did not distinguish between defendants in its analysis. We focus on D, the mortgage lender, because the performance of the arrangement between P and T in *DeVoto* was dependent on the arrangement between T and D, just as the Lees' ability to obtain the benefit of its business relationships with the Korean customers was dependent on the Agreement. The Ninth Circuit, speaking through then Judge Kennedy, entered judgment for D for the following reasons:

"In the instant case no purpose to injure the plaintiffs was demonstrated. The business relation between the brokers and [T] was of no concern to the defendants. Commissions anticipated by the broker did not, in any degree, motivate the defendants' interference with the contract between [D and T]. The object of the interference was the principal contract, not the brokers' arrangement incidental to it. The brokers and their commissions were entirely unrelated to any motivation of the defendants, and it was not the goal or design of the interference to acquire the value of the commission. Absent a motive or purpose to injure the plaintiffs, or to appropriate an economic advantage belonging to them, or some other aggravating circumstances, the acts of [D] were not

tortious as to the plaintiffs. The plaintiffs failed to establish these essential elements."

*Id.* at 1348–49.

Some courts, without expressly utilizing the distinction between intent, based on foreseeability of effect, on the one hand and motive or purpose on the other, have reached the same result by characterizing as "incidental" the effects on the relationship between P and T of the breach of contract between P and D. An example is *Bank Computer Network Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 110 Ill.App.3d 492, 66 Ill.Dec. 160, 442 N.E.2d 586 (1982). The contract was between the bank (D) and its depositor (P), a business corporation. P's overdue and unsecured loan from the bank exceeded $150,000 but was the subject of negotiations between P and D. D called the loan and offset the entire balance in P's checking account, $95,000, against the loan balance. This caused the dishonor of several outstanding checks which P had written to third parties (T). Summary judgment granted by the trial court for D was in part reversed because there was a factual issue whether D was estopped to offset P's deposit against the loan. Nevertheless, against that background of breach of the bank-depositor contract, summary judgment for D on the interference with business claim was affirmed. There was no evidence that the bank's "intent was *to interfere with [P's] business relations." Id.* at 501, 66 Ill.Dec. at 167, 442 N.E.2d at 593. The court cited and partially quoted W. Prosser, *Handbook of The Law of Torts* § 130, at 952 (4th ed.1971) where the full text reads: "No case has been found in which intended but purely incidental interference resulting from the pursuit of the defendant's own ends by proper means has been held to be actionable." The Illinois court went on to hold: "Even if the means were not proper, they do not approach the level of legal malice. We therefore conclude that the interference is more appropriately labeled 'incidental' rather than 'intentional'." 110 Ill.App.3d at 501, 66 Ill.Dec. at 167, 442 N.E.2d at 593.

Other cases to the same general effect are *DiCesare-Engler Prods., Inc. v. Mainman Ltd.*, 81 F.R.D. 703 (W.D.Pa. 1979) (recognizing rule that malicious interference does not lie for incidental interferences arising from a breach of contract but holding good, against a motion to dismiss, a complaint by the local promoter (P) of a concert by a rock singer which alleged that the producer (D) had cancelled the concert for the purpose of damaging P's relations with the concert hall (T)); *Ethyl Corp. v. Balter*, 386 So.2d 1220, 1224 (Fla.App.1980), *cert. denied*, 452 U.S. 955, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981) ("There is no such thing as a cause of action for interference which is only negligently or consequentially effected."); *Hales v. Ashland Oil Co.*, 342 So.2d 984 (Fla.App.1977), *cert. denied*, 359 So.2d 1214 (Fla. 1978) (contract purchasers of trawlers (P) held to have at best been indirectly affected by breach by manufacturer (D) of contract to supply hulls to boatbuilder (T)); *Glazer v. Chandler*, 414 Pa. 304, 308, 200 A.2d 416, 418 (1964) ("[W]here ... the allegations and evidence only disclose that defendant breached his contracts with plaintiff and that as an incidental consequence thereof plaintiff's business relationships with third parties have been affected, an action lies only in contract for defendant's breaches, and the consequential damages recoverable, if any, may be adjudicated only in that action." (Footnote omitted)).

From the premise that the tort of interference with economic relations will be recognized if D's means of interference with the P-T relation are sufficiently improper, the Lees argue that appellants' conduct should be labeled "egregious" and that the tort should be found to have been committed here. One defect we find in the argument is that it seeks to apply to an essentially two party situation law relevant to a three party situation. The degree of impropriety of the means employed by D in breaching a P-D contract should not convert an incidental interference with a P-T relationship, foreseeably resulting from the breach, into an interference having the purpose or object of

interfering with P's relationship with T. Secondarily, the means employed here were neither illegal nor tortious.

Highly improper means can be determinative of the existence of the tort where D's motive in directing interference at the P–T relationship is other than acquiring for D the benefit of the economic relations between P and T. An example is *Tamiami Trail Tours v. Cotton*, 463 So.2d 1126 (Fla.1985), *aff'g in part and rev'g in part*, 432 So.2d 148 (Fla.App.1983). The owner of two taxicabs (P) sought fares from among the passengers arriving at D's bus terminal in Fort Walton Beach, Florida. D's manager at the terminal engaged in a campaign to discourage prospective fares (Ts) from using P's cabs. The manager would tell Ts that P would probably take them off and rob them, the manager would lose or delay Ts' baggage, the manager was observed throwing roofing tacks under the tires of P's cabs, the manager cut the wires of a telephone which P had installed on property adjoining the bus station, the manager threatened to kill P and shortly thereafter assaulted P. The Supreme Court of Florida saw "no logical reason why one who damages another in his business relationships should escape liability because his motive is malice rather than greed." 463 So.2d at 1128.[10]

The types of unlawful means which "have been held to result in liability" for interference with prospective advantage were listed by Dean Prosser. They are "violence or intimidation, defamation, injurious falsehood or other fraud, violation of the criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith[.]" W. Prosser, *Law of Torts, supra,* 952–53 (footnotes omitted).

There is no evidence of such conduct here. The means employed by appellants to reenter, in breach of the commercial lease between the parties, were neither illegal nor

---

10. In part III B 3, *infra,* dealing with the conversion claim, we conclude that the lockout and lack of notice thereof do not support a finding of actual malice here.

tortious. At common law prior to the Statute of 5 Richard II, ch. 8 (1381) "wherever a right of entry existed, the party entitled to such right might lawfully enter, oust the disseisor, and regain the possession by force, if force was necessary for that purpose." *Manning v. Brown,* 47 Md. 506, 511 (1878). The Statute of Richard made forcible entry a crime.[11] That statute, expanded by the Statute of 8 Henry VI, ch. 9 (1429) to include forcible detainer, is in effect in Maryland. *See Moxley v. Acker,* 294 Md. 47, 447 A.2d 857 (1982). Thus, where a lease has expired by its terms "the lessor may at once re-enter and resume possession, but may not put the tenant out by force, and the lessee becomes a wrongdoer if he does not surrender his possession." *Smith v. Pritchett,* 168 Md. 347, 350, 178 A. 113, 115 (1935). *See also Toy Fair, Inc. v. Kimmel,* 177 F.Supp. 129, 134 (D.Md. 1959) ("Re-entry is a proper remedy for ... breach [of commercial lease]. It is not necessary that the landlord resort to legal process."); Rhynhart, *Notes on the Law of Landlord and Tenant,* 20 Md.L.Rev. 1, 45 (1960). The Lees do not argue that any Maryland statute changes the law as reflected by the foregoing authorities.

Here appellants retook possession of the restaurant premises by changing the locks without notice.[12] But K & K owns the premises. The Lees' rights either to occupy the

---

**11.** 5 Richard II Stat. 1, ch. 8, as reproduced in 1 J. Alexander, British Statutes in Force in Maryland 247 (Coe 2d ed. 1912) reads:

"And also the King defendeth, That none from henceforth make any Entry into any Lands and Tenements, but in case where Entry is given by the Law, and in such case not with strong hand, nor with multitude of people, but only in peaceable and easy manner. And if any man from henceforth do to the contrary, and thereof be duly convict, he shall be punished by Imprisonment of his Body, and thereof ransomed at the King's Will."

**12.** The incidental interference with the Lees' relationship with the Korean customers was effected by the lockout and not by the conversion of certain equipment or utensils. Even if the Agreement had clearly specified that equipment purchased through the business accounts was the Lees' property and the Lees had been permitted to remove it, the Seoul Restaurant would nevertheless have remained closed.

premises or to receive notice of termination rested on the
Agreement. Appellants' action was unlawful exclusively in
the sense that it was a breach of contract. *Compare
Natural Design* (D's interference, for summary judgment
purposes, was both a violation of antitrust statutes and of
an independent tort duty).[13]

The Lees' position necessarily is that breach of the Agree-
ment, coupled with the foreseeability of the effect of that
breach on relations with the Korean customers, constitutes
the tort. The only decision cited by the Lees in their brief
which supports that position is *Cherberg v. Peoples Nat'l
Bank of Washington*, 88 Wash.2d 595, 564 P.2d 1137 (1977).

In *Cherberg* D owned a building in downtown Seattle and
leased a portion of it to P where P operated a restaurant.
When the adjoining building was razed, preliminary to
constructing an office tower, the exposed exterior wall of
D's building required repairs which D refused to perform.
P sued D for malicious interference with P's relations with
its customers (T) during the period preceding repair of the
wall by the adjoining property owner. P obtained judgment
on a jury verdict. The Washington Court of Appeals re-
versed, concluding that the interference with the P–T rela-
tionship was incidental to the breach of the lease by D. 15
Wash.App. 336, 549 P.2d 46 (1976). The Supreme Court of
Washington reversed. It pointed out that the record failed
to indicate that the building would not provide D "with a
satisfactory return if the wall had been repaired by the

---

13. Legal scholars have pondered where the bounds of the tort might
be fixed in some principled fashion if a court recognizes that D may
tortiously interfere with the P–T economic relationship by means
other than those which are illegal or tortious in and of themselves.
*See, e.g.,* Dobbs, *Tortious Interference with Contractual Relationships,*
34 Ark.L.Rev. 335 (1980); Dowling, *A Contract Theory for a Complex
Tort: Limiting Interference with Contract Beyond the Unlawful Means
Test,* 40 U.Miami L.Rev. 487 (1986); Perlman, *Interference with Con-
tract and Other Economic Expectancies: A Clash of Tort and Contract
Doctrine,* 49 U.Chi.L.Rev. 61 (1982). Our exploration of this poorly
charted territory is limited to considering whether breach of a P–D
contract can convert an incidental interference with P's relations with
T into the interference tort.

lessor and the lessees' rights under the lease respected."
88 Wash.2d at 605, 564 P.2d at 1144. Further, there was
evidence permitting an inference that "the lessor used the
condition of the wall as a means to oust [P] and gain
possession of the leased premises in order that the lessor
might put those premises to a different and perhaps consid-
erably more profitable use." *Id.* A breach based on that
motive would demonstrate "a failure to make a good faith
effort to meet obligations under the lease and may give rise
to liability in tort." *Id.*

*Prosser and Keeton, supra,* at 990 n. 24, observes that
the effect of the *Cherberg* approach "may be to permit
recovery of damages that would not be available if the
promisor's actions were regarded solely as a breach of
contract." That observation is particularly apt and we
decline the Lees' invitation to embrace *Cherberg*'s ratio-
nale. A rule under which a breach of contract is to be
classified as a good faith or bad faith breach, coupled with a
rule that bad faith can be inferred if the motive for the
breach is to realize more than what the jury might conclude
is a reasonable return on investment, converts a breach of
contract into an intentional tort. Contrary to the settled
policy of Maryland law, the *Cherberg* approach would allow
punitive damages for a pure breach of contract. *See Miller
Bldg. Supply v. Rosen,* 305 Md. 341, 503 A.2d 1344 (1986);
*Food Fair Stores v. Hevey,* 275 Md. 50, 338 A.2d 43 (1975);
*St. Paul at Chase v. Manufacturers Life Ins. Co.,* 262 Md.
192, 278 A.2d 12, *cert. denied,* 404 U.S. 857, 92 S.Ct. 104, 30
L.Ed.2d 98 (1971). That same policy underlies the Maryland
rule requiring proof of actual malice for punitive damages
in intentional torts arising out of contractual relations. *See
infra* part III B 3. That rule has been part of Maryland
law since at least 1908 and was established in a case
involving tortious interference with business relations. *See
Knickerbocker Ice Co. v. Gardiner Dairy Co.,* 107 Md. 556,
69 A. 405 (1908).

If breach of the P-D contract were treated as an improp-
er means which overrides the lack of motive to interfere in

the incidental relations between P and T, then the interference tort becomes boundless and only rarely would the breach of a commercial contract fail to be a tort as well.

Finally, appellees suggest that the officers of K & K were motivated by racial or ethnic prejudice which combines with the lockout and lack of notice to produce the tort. This contention is not supported by sufficient evidence, and we intimate no opinion on its legal sufficiency. Without objection or motion to strike both Mr. Lee and Kimberly Lee speculated that the Kirbys were motivated by prejudice against Koreans. The only factual evidence even remotely related to the allegation concerns one occasion when the resident manager of the motel directed a group of Korean–Americans to cease occupying chairs in the lobby because the manager mistakenly inferred that the seated persons were restaurant patrons when they were in fact motel guests. Whatever the relevance of this incident might be, because it is undisputed that the Kirbys sought out the Lees, that the Kirbys subsequently hired Mr. Lee to manage a restaurant in Falls Church, that the Agreement continued in effect for two years before terminated by breach, and because there is no explanation why the Kirbys should suddenly become prejudiced against Koreans, the contention has no merit.

For the foregoing reasons the trial court erred in denying appellants' motion for judgment on the claim for malicious interference.[14]

---

**14.** In their brief the Lees emphasize that the individual appellants did not have a contractual relationship with the Lees, but only K & K did. At oral argument counsel for the Lees disclaimed ever contending that the conduct of the individual appellants amounted to interference with the contract between K & K and the Lees. In light of that concession, we interpret the Lees' brief to argue that the interference tort was committed by the individual appellants, as well as by the corporation for which they were acting.

In any event, we reject an analysis under which corporate officers, agents or employees, acting on behalf of a corporation within the scope of their authority, are viewed as actors (D) separate from their corporation (T) and thereby can maliciously interfere with business

## III

K & K makes three arguments with respect to the conversion judgment awarded against it. It claims that the Lees (1) failed to establish a right of possession to the property in question, (2) did not demand the return of that property, and (3) did not submit sufficient evidence of malice to support the punitive damages award. The Lees assert these arguments are neither meritorious nor preserved.

### A

The appellees' nonpreservation argument rests on the absence of exceptions to instructions bearing on the three points set forth above. Each point involves the sufficiency of the evidence, either as to the elements of the tort or as to the support for punitive damages. These sufficiency issues were preserved by appellants' motion for judgment. For substantially the same reasons given in part II A, *supra*, we reject this nonpreservation contention as well.

### B

#### 1

Closing the restaurant barred the Lees from access to the premises and thus to all property contained therein. They were permitted on at least two occasions (the first being the morning of the day of closing) to remove personal

---

relations between their corporation (T) and the plaintiff (P). The Court of Special Appeals rejected that analysis in *Continental Casualty Co. v. Mirabile*, 52 Md.App. 387, 402, 449 A.2d 1176, 1185, *cert. denied*, 294 Md. 652 (1982). The *Mirabile* holding is in accord with the general rule. *See Battista v. Lebanon Trotting Ass'n*, 538 F.2d 111 (6th Cir.1976); *Pace v. Garcia*, 631 F.Supp. 1417 (W.D.Tex.1986); *Stratford Group, Ltd. v. Interstate Bakeries*, 590 F.Supp. 859 (S.D.N.Y.1984); *Allison v. American Airlines*, 112 F.Supp. 37 (N.D.Okla.1953); *Rozell v. Stiefermann*, 726 S.W.2d 342 (Mo.App.1987); *Murtha v. Yonkers Child Care Ass'n*, 45 N.Y.2d 913, 383 N.E.2d 865, 411 N.Y.S.2d 219 (1978); *Wampler v. Palmerton*, 250 Or. 65, 439 P.2d 601 (1968); *Houser v. City of Redmond*, 91 Wash.2d 36, 586 P.2d 482 (1978); *Kvenild v. Taylor*, 594 P.2d 972 (Wyo.1979).

effects and equipment the Lees had brought with them from University Parkway. None of this property is the subject of the conversion claim before us. The Lees, however, were not permitted, then or later, to remove equipment and furniture purchased during the operation of the restaurant with funds from the business accounts. The morning of closing the Lees were told separately, by Robert Jr. and Phillip, that they could not remove any items purchased through the business accounts. At that time the Lees did not dispute the position taken by K & K concerning ownership of those purchases.

As the evidence evolved at trial the conversion claim ultimately focused on specific items of personalty set forth on a list prepared overnight by Mr. Lee while he was on the stand. The total cost of the items when new was $24,640. We shall assume, most favorably to K & K, that each listed item was purchased with funds from the business accounts.[15]

The dispute over ownership of the listed personalty turns on the proper construction of the Agreement. It provides in two places that, on termination, "improvements" become the property of K & K. The evidence of the Lees was that those provisions were intended to be limited to improvements which could not be removed on termination without damage to the realty, in effect, much like the common law doctrine of fixtures. Mr. Lee contrasted the disputed personalty with other acquisitions paid for from the business accounts which he said constituted "improvements" within the meaning of the Agreement and which he listed on a separate exhibit. K & K's position seems to be (1) that

---

15. The Lees also contend before us, as they did at trial, that they were not permitted to remove from the premises certain property which they assert was purchased by them from the restaurant's previous operator, Meyers. Although there was testimony to this effect by Mr. Lee, on our review of the record, it does not appear that any of the property purportedly purchased from Meyers was contained on the list of allegedly converted property admitted into evidence. At trial, Mr. Lee agreed that this list constituted the "total amount [in cash value] of the equipment ... left at the Harbor City Inn."

"improvements" means any upgrading, including a new replacement for older equipment and/or (2) that the general operation of the business accounts was intended to result in K & K's ownership of the disputed personalty on termination. To support their position K & K relies on testimony of Kimberly Lee. From K & K's standpoint the record at best presents a contractual ambiguity with factual issues bearing on the interpretation of the Agreement. There was no error in submitting the ownership issue for jury resolution by the process of resolving the ambiguity in the contract in light of conflicting evidence, all pursuant to instructions to which no exception was taken.

2

K & K next challenges the conversion claim on the basis that the Lees failed to request that K & K return their property. This fact is conceded by the Lees. They argue, however, that under the circumstances of the conversion, no demand was required in order to establish a prima facie case. We agree. The question here is simply whether the conversion was direct or constructive.

This Court has recognized the necessity of a demand for the return of allegedly converted property and a corresponding refusal to return it in cases of constructive conversion. *Durst v. Durst*, 225 Md. 175, 179, 169 A.2d 755, 756 (1961); *Maryland Lumber Co. v. White*, 205 Md. 180, 197, 107 A.2d 73, 79 (1954); *Mattingly v. Mattingly*, 150 Md. 671, 674–75, 133 A. 625, 626 (1926). Constructive conversion is predicated on possession by the defendant that was initially lawful or rightful. *Durst*, 225 Md. at 179, 169 A.2d at 756; *Mattingly*, 150 Md. at 675, 133 A. at 626; *Parlett Ford, Inc. v. Sosslau*, 19 Md.App. 320, 322, 311 A.2d 443, 445 (1973), *cert. denied*, 271 Md. 744 (1974). For example, a conversion may be constructive in a case of bailment where the plaintiff voluntarily surrenders possession to the defendant, or in certain instances where the defendant obtains possession through a third party. *See Mattingly*, 150 Md. at 675, 133 A. at 626; *Bender v.*

*Bender,* 57 Md.App. 593, 598–99, 471 A.2d 335, 337, *cert. denied,* 300 Md. 152, 476 A.2d 721 (1984). On the other hand, where the conversion is not constructive, but direct, the taking is considered to be per se tortious and the requirements of demand and refusal do not apply. *Durst,* 225 Md. at 179, 169 A.2d at 756; *Bender,* 57 Md.App. at 599, 471 A.2d at 337.

Here, K & K asserts that if there was a conversion, the taking could not be per se tortious because the evidence, at a minimum, established K & K's entitlement to equal possession. We do not share this view of the evidence.

As we have just stated, the Agreement is at best ambiguous as to K & K's ownership interest in the listed personalty. The Agreement does not expressly create a shared possessory interest in the chattels. Furthermore, the ambiguity in the Agreement was resolved by the jury in favor of the Lees. By proceeding to exercise ownership over the property in reliance on the Agreement which did not clearly establish its right to the property, K & K ran the risk that there would be no legal justification for its action. *See Keys v. Chrysler Credit Corp.,* 303 Md. 397, 414, 494 A.2d 200, 208 (1985). That is, it ran the risk that a jury would find it lacked any possessory interest in the property. The jury apparently so found, and thus concluded that there was a direct conversion. The Lees, therefore, were not required to demand return of the property in order to establish their case.

3

K & K next challenges the punitive damage award with respect to the conversion claim. It argues that there was no evidence of actual malice and thus no basis for allowing the jury to assess punitive damages for conversion.

The conversion claim on the facts before us is a perfect example of a tort arising out of contract. *See Wedeman v. City Chevrolet Co.,* 278 Md. 524, 528, 366 A.2d 7, 10 (1976), and cases cited therein. A tort is one arising out of a contract where "the contractual relationship preexist[s] the

tortious conduct[,]" and, but for the contractual relationship, "the wrong would not have been committed." *Id.* at 529, 366 A.2d at 11. There is also the additional requirement that there exist "a direct nexus between the tortious act and performance or breach of the terms and conditions of the parties' underlying contract." *General Motors Corp. v. Piskor,* 281 Md. 627, 640, 381 A.2d 16, 23 (1977); *New Summit Assocs. v. Nistle,* 73 Md.App. 351, 364–65, 533 A.2d 1350, 1356 (1987). There is no real dispute that the requirements of a tort arising out of a contract are here met. K & K purported to exercise a right under the Agreement in claiming ownership of the personalty in dispute, but that justification rested on an interpretation which the jury did not accept.

In a tort action arising out of contract, punitive damages are recoverable only where the plaintiff establishes actual malice. *See Piskor,* 281 Md. at 636–37, 381 A.2d at 22; *Henderson v. Maryland Nat'l Bank,* 278 Md. 514, 519, 366 A.2d 1, 4 (1976); *Hevey,* 275 Md. at 54, 338 A.2d at 45–46; *H & R Block v. Testerman,* 275 Md. 36, 44–45, 338 A.2d 48, 53 (1975). In *Testerman* we stated that actual malice "has been characterized as the performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." 275 Md. at 43, 338 A.2d at 52.

We, of course, recognize that proving actual malice, as we have so characterized it, is sometimes an onerous burden. Direct evidence of hate, rancor, or evil motive may be difficult and in some circumstances impossible to obtain. Here, there is no direct evidence of actual malice.

Failure to produce direct evidence of actual malice, however, does not necessarily preclude an award of punitive damages. Actual malice can be inferred from circumstantial evidence. *Henderson,* 278 Md. at 520, 366 A.2d at 4. *McClung–Logan Equip. Co. v. Thomas,* 226 Md. 136, 148, 172 A.2d 494, 500 (1961); *Staub v. Staub,* 37 Md.App. 141,

147, 376 A.2d 1129, 1134 (1977). In *Henderson* we recognized that "[i]n the commercial sphere . . . where an impersonal relationship is more likely to prevail, such emotions as anger or spite are not always vented in a direct manner, and not infrequently find their expression in the facts and circumstances surrounding the tortious conduct." 278 Md. at 520, 366 A.2d at 4.

Whether the business accounts personalty was or was not converted ultimately depended upon which of the parties owned it on termination which, in turn, depended upon the construction placed on the Agreement. In that respect this case is similar to *Siegman v. Equitable Trust Co.*, 267 Md. 309, 297 A.2d 758 (1972) where the defendant bank was found to have converted the proceeds of a joint checking account. One of the plaintiffs had endorsed to, and cashed with, the defendant a check bearing a forged prior endorsement. The bank offset the amount of the forged check against the plaintiffs' joint account which led to litigation in which a circuit court determined that Maryland law did not permit the debt of one joint account owner to be charged against the joint account. In a later conversion action the jury awarded punitive damages but the trial court set them aside. This Court affirmed because the bank's mistaken understanding of the law did not furnish evidence "that the bank either converted [the funds] or refused to honor [the] checks out of evil motives intended to injure the [plaintiffs]." *Id.* at 316, 297 A.2d at 761.

*Hevey*, 275 Md. 50, 338 A.2d 43 is also analogous. Earlier, in *Food Fair Stores v. Greeley*, 264 Md. 105, 285 A.2d 632 (1972), this Court held void, as contrary to public policy, a provision of the retirement plan of Food Fair Stores under which employees who resigned in order to work for competitors forfeited any rights under the plan. Eleven months after *Greeley* was decided, during which period Food Fair failed to take any remedial action, the plaintiffs in *Hevey* sued, claiming conversion of their benefits. The trial court refused to withdraw the issue of punitive damages from jury consideration because, in that court's view, the circum-

stances of the parties gave rise to inferences of oppression on the part of Food Fair. This Court, in reversing, would not sustain punitive damages "upon what amounted to an adhesion contract theory." 275 Md. at 57, 338 A.2d at 47.

In two cases involving repossessions we have found sufficient evidence of actual malice in the surrounding facts. *Henderson*, 278 Md. 514, 366 A.2d 1, involved a borrower who had fully paid his automobile loan but the bank had confused the plaintiff's account with that of a delinquent borrower. Plaintiff's efforts to resolve the problem by telephone were frustratingly unsuccessful. Those efforts culminated in the bank's insisting that the plaintiff bring original records from Alexandria, Virginia to the bank's office in College Park, Maryland. The plaintiff refused to do so, using well-chosen expletives. We said there was an inference that the bank's employee, provoked at the plaintiff's angry refusal to bring the records, caused the automobile to be repossessed in order to force production of the records or to punish the plaintiff for the refusal. In *McClung–Logan*, there was a reasonable inference that the defendant had seized a tractor in which the defendant did not have a present security interest because the defendant "became provoked with [plaintiff's] numerous requests that the defective condition of the tractor be corrected and that [the defendant] determined to put a stop to the complaints by seizing the tractor and forcing the [plaintiff] to sign a release of all claims that he might have." 226 Md. at 149, 172 A.2d at 501.

In the instant matter the jury could have found overreaching by K & K in its claim under the contract to personalty purchased through the business accounts. But taking all of the inferences which may reasonably be drawn from the evidence most favorably to the Lees, K & K's "object was merely to benefit itself," *Knickerbocker Ice Co. v. Gardiner Dairy Co.*, 107 Md. at 569, 69 A. at 410. That is not sufficient to support a finding of actual malice.

Actual malice in the conversion may not be inferred from the means used to effect repossession of the premises. The means was self-help, unaccompanied by any advance notice that self-help would be utilized. We do not encourage resort to self-help and, for all of the practical reasons which the instant action makes abundantly clear, the Bar usually counsels against it. *See* Maryland Institute for Continuing Professional Education of Lawyers, Inc., *Commercial Leases* 257, 259 (1987). Nevertheless, self-help is not a prohibited means of acquiring repossession of premises upon termination of a commercial lease, so long as the repossession can be effected peacefully. *See supra* text following note 10.[16]

Here, K & K reacquired possession by a method which was in fact peaceful, and which was not per se illegal or tortious, but which was not authorized because no breach of the lease was established. Our cases reviewed above have required more than a breach of contract to permit an inference of actual malice.

Further, the alleged breach, as evidenced by the Employment Security Administration finding, was of a covenant in the Agreement which did not provide for notice by K & K, if K & K exercised its option to terminate for that claimed breach. Given the asserted basis for re-entry and the lack

---

16. The dissent to this opinion vaguely refers to "testimony regarding tense and angry moments between Robert Kirby, Sr., and Mr. Lee as well as between Mr. Dahlseid and Kim Lee." Dissenting op. at 190. Fleshed out with the facts, the "angry moments" do not tend to prove actual malice.

About one month *before* the Kirbys hired Mr. Lee to manage the restaurant in Falls Church, a member of the U.S. Marine Corps stayed at Harbor City Inn and received very poor service in the restaurant. That marine inferred that he was treated badly because he was black and complained to the K & K offices in Virginia. As a result Robert Sr. drove to the Harbor City Inn and, with raised voice, made the point to Mr. Lee that racial discrimination would not be tolerated.

There was also evidence that, at some point, Mr. Dahlseid censured Kim because she was in an otherwise unoccupied motel room, watching television. It would have created a bad impression if a guest who had been assigned the room entered during that time. Kim wrote K & K a letter apologizing for the incident.

of prohibition against peaceful self-help, the re-entry without notice after the restaurant closed for business was entirely compatible with a desire to avoid a confrontation possibly leading to violence. In any event, the jury's rejection of the factual basis for invoking the lease provision allowing immediate re-entry without notice does not convert the lack of notice, even inferentially, into affirmative evidence of actual malice.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY ON COUNT I (BREACH OF CONTRACT) AFFIRMED; ON COUNT III (CONVERSION) AFFIRMED AS TO COMPENSATORY DAMAGES AND REVERSED AS TO PUNITIVE DAMAGES; AND ON COUNT VI (INTERFERENCE WITH BUSINESS) REVERSED. COSTS TO BE EQUALLY DIVIDED BETWEEN APPELLANTS AND APPELLEES.

ADKINS, Judge, concurring in part and dissenting in part:

The majority's analysis of the breach of contract, expert witness, and preservation issues in this case is thorough and scholarly. I concur in Parts I, II.A, and III.A of the majority opinion. Nor do I quarrel with its holdings as to conversion and compensatory damages as set forth in Part III.B.1 and 2. We part company, however, on the questions of (1) whether it was proper to submit the tortious interference issue to the jury, and (2) the lack of evidence to support an award of punitive damages on the conversion claim (Part II.B and Part III.B.3).

I.

Turning first to the tortious interference issue, I am prepared to assume that if (to use the majority's formulation) "D interferes with D's own contract with P, D does not, on that ground alone, commit tortious interference and P's remedy is for breach of the contract between P and D." *K & K Management, Inc. v. Chul Woo Lee*, 316 Md. 137, 156, 557 A.2d 965, 974 (1989). That two-party situation is

what the Court was talking about in *Wilmington Trust Co. v. Clark*, 289 Md. 313, 329, 424 A.2d 744, 754 (1981), when we said we had "never permitted recovery for the tort of intentional interference with a contract when both the defendant and the plaintiff were parties to the contract." It also explains the statement in W. Prosser, *The Law of Torts* § 129, at 990 (W. Keeton 5th ed.1984) to the effect that "[t]he defendant's breach of his own contract with the plaintiff is of course not a basis for the tort."

But this case does not involve that two-party scenario. It involves, as the majority concedes, "the *Natural Design* [, *Inc. v. Rouse Co.*, 302 Md. 47, 485 A.2d 663 (1984) ]—Restatement [ (Second) of Torts (1979) ] § 766B variety of the tort." *K & K*, 316 Md. at 158, 557 A.2d at 975. The Lees' claim is that K & K and the individual Kirbys prevented the Lees from acquiring or maintaining advantageous economic relationships with third parties (tortious interference by D with prospective business relationship between P and T).

As to that "variety of the tort," the majority observes that interference with prospective business relations is intentional if the interferer " 'desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action.' " *Id.* at 158, 557 A.2d at 975 (quoting Restatement (Second) of Torts § 766B, comment d). As I shall explain further on, there is sufficient evidence here from which a jury could determine that K & K's interfering conduct was calculated to enhance injury to the Lees and that this evidence necessarily reflects a desire to interfere. The majority analysis also finds insufficient evidence of improper conduct to permit submission of the tortious interference issue to the jury. Under § 767 of the Restatement (Second),[1] whether improper conduct exists is determined by balancing a number of factors. Thus, for example, the more egregious D's purpose, the more likely is a finding of improper conduct. If D breaches his or her contract with P in order to prevent P's perform-

---

1. Quoted in *K & K*, 316 Md. at 159 n. 7, 557 A.2d at 975 n. 7.

ance of a prospective contract between P and T (again using the majority's symbols) so that D obtains the benefit of an economic relationship with T, a tortious interference action will lie. *Sumwalt Ice & Coal Co. v. Knickerbocker Ice Co.,* 114 Md. 403, 80 A. 48 (1911); *Winternitz v. Summit Hills,* 73 Md.App. 16, 532 A.2d 1089 (1987), *cert. denied,* 312 Md. 127, 538 A.2d 778 (1988). The same result would ensue if the means of interference are themselves illegal or tortious, as this Court observed some time ago in the *Sumwalt* case. 114 Md. at 413–414, 80 A. at 50. *See also, e.g.,* W. Prosser, *Handbook of the Law of Torts* § 130, at 1007–1008 (5th ed.1984). The majority apparently also acknowledges that the cause of action would lie where the means of interference employed are either illegal or tortious. *K & K,* 316 Md. at 166, 557 A.2d at 979.

In this case there was a tort committed by K & K which interfered with the Lees' prospective business relationships, a tort in which the Kirbys played a significant role. That tort was the unlawful conversion of the Lees' personalty purchased through the business accounts. The Court is unanimous on the issue of K & K's liability for that conversion. Yet the majority fails to recognize the significance of the conversion with respect to the Lees' interference claim.

Part II.B of the majority opinion discusses, at length, the interference tort. Throughout, the focus is on the lockout (and K & K's declaration that the Agreement was void) as breach of the contract, and breach of the contract as interference with the Lees' prospective business relationships. I am prepared to assume that the majority is correct in concluding "[t]he means employed by the appellants to reenter [*i.e.,* the lockout], in breach of the commercial lease between the parties, were neither illegal nor tortious." *Id.* at 166, 557 A.2d at 979. But breach of the Agreement was not the sum total of the interfering conduct. The majority's analysis in Part II.B is almost completely devoid of any discussion of the tortious conversion, even though the Lees in Count VI of their amended complaint, specifically alleged and relied on that act as one of the two bases (the

other being breach of contract) for their interference claim. The majority, in a brief footnote, dismisses this assertion by stating "[t]he incidental interference with the Lees' relationship with the Korean customers was effected by the lockout and not by the conversion of certain equipment or utensils." *K & K,* 316 Md. at 167 n. 12, 557 A.2d at 980 n. 12. I cannot countenance such a cursory dismissal.

It is important to recognize that the Lees' relationship with their Korean customers was well established prior to the moving of the Seoul Restaurant to the Harbor City Inn. When the Seoul Restaurant was located on University Parkway, it "drew general patronage from the locality and among Korean–Americans from the greater metropolitan area. The Seoul Restaurant became the place for luncheon and dinner meetings of Korean organizations and for social functions within the Korean community." *Id.* at 141, 557 A.2d at 967. There was substantial evidence presented at trial that this patronage followed the restaurant to its new location in the Harbor City Inn. The significance of that following cannot be gainsaid. It strongly suggests that the relationship was not dependent on the restaurant's location in a particular place in Baltimore; rather, the customer's relationship was with the restaurant itself and with the family that ran it. When K & K effected the lockout, it interfered with that relationship by barring the Lees from operating the Seoul Restaurant in that particular location. But as I stated earlier, this was not the sum of the interference with the Lees' prospective business relationships. When K & K unlawfully converted the Lees' chattels, it substantially interfered with the Lees' relationship with their Korean customers by limiting the Lees' ability to establish the Seoul Restaurant elsewhere in Baltimore. The property wrongfully converted by K & K was of no small significance. It consisted of 10 banquet tables, 150 chairs, stereo, refrigerator, freezer, large and small stove, slicer, cash register, amplifier, band equipment, cooking equipment (*e.g.,* pots, pans, etc.), glassware, dishes, tableware,

office desk and chair, ice machine, ice crusher, small ice cream freezer, and bar equipment.

To highlight the importance of the conversion interference, I offer the following example. P, a plumber, leases a truck from D. D materially breaches the contract by repossessing the truck without legal justification. In doing so, D also wrongfully converts all of P's plumbing equipment on the truck at the time of the repossession. The relationship that P has with his prospective customers is not dependent on his using a particular truck. Rather, the relationship is dependent on his being able to offer a particular service, of which the truck is only a component part. P could have leased, borrowed, or bought another truck and continued serving his customers, but for the fact that he no longer possesses the plumbing equipment necessary to continue this service. In this example, undoubtedly, the repossession and the conversion both collectively and singly effect interference with P's prospective business relations.

Once it is recognized, in the case at bar, that the breach of the Agreement and the conversion both collectively and singly effected interference with the Lees' relationship with the restaurant's customers, several of the cases on which the majority relies are readily distinguishable. For instance, the majority cites *DiCesare–Engler Prods., Inc. v. Mainman, Ltd.*, 81 F.R.D. 703 (W.D.Pa.1979), as "recognizing [the] rule that malicious interference does not lie for incidental interferences arising from a breach of contract...." *K & K*, 316 Md. at 165, 557 A.2d at 978. It also cites *Glazer v. Chandler*, 414 Pa. 304, 308, 200 A.2d 416, 418 (1964), for the proposition that " 'where ... *the allegations and evidence only disclose that defendant breached his contracts* with plaintiff and that as an incidental consequence thereof plaintiff's business relationship with third parties have been affected, an action lies only in contract for defendant's breaches, and the consequential damages recoverable, if any, may be adjudicated only in that action.' " *K & K*, 316 Md. at 165, 557 A.2d at 979 [emphasis supplied]. Quite plainly there are, in this case,

allegations and evidence of something more than a simple breach of contract. Although the conversion arises out of the contract, *id.* at 174, 557 A.2d at 983, in no fashion can this tort and its resultant interference be categorized as incidental to the breach of that contract. The fact that the tort arises out of a contract is significant only in connection with the kind of malice that must be established in order to recover punitive damages for the conversion. *See General Motors Corp. v. Piskor*, 281 Md. 627, 636–637, 381 A.2d 16, 22 (1977); *Henderson v. Maryland Nat'l Bank*, 278 Md. 514, 519, 366 A.2d 1, 4 (1976); *H & R Block v. Testerman*, 275 Md. 36, 44–45, 338 A.2d 48, 53 (1975). It does not alter the conclusion that the conversion tort is independent of the breach of contract. At most, the breach of contract supplied K & K with the opportunity to commit the conversion.

It may be that simply proving that the interference was effectuated by means of a tort is sufficient to meet the malice element of the cause of action.[2] *See Tamiami Trail Tours v. Cotton*, 463 So.2d 1126 (Fla.1985), *aff'g in part and rev'g in part*, 432 So.2d 148 (Fla.App.1983) (discussed by the majority at 316 Md. at 166, 557 A.2d at 979). That said, however, there is additional evidence of malice in this case such that the existence of the tort of conversion need not be relied on as the exclusive evidence of malice.

Even if the interference attributable to the conversion is discounted, the combination of the closing of the restaurant and the conversion, coupled with the attendant circumstances, is sufficient to maintain the interference claim. If the breaching party's "outrageous acts" go beyond simple breach of contract, an action for tortious interference with business relationships with third parties may be maintained. *Bolz v. Myers*, 200 Mont. 286, 292–295, 651 P.2d 606, 609–611 (1982). A breach of contract coupled with intent to

---

**2.** The "malice" element is the third element listed in *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 69, 485 A.2d 663, 674 (1984), which requires that the act be "done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice)...."

injure is enough to satisfy the "improper means" requirement. *Leigh Furniture and Carpet Co. v. Isom,* 657 P.2d 293, 309–311 (Utah 1982). A bad faith breach of contract, which a jury might well have found here, may be sufficient if coupled with foreseeability of its adverse effect on relations between P and T. *Cherberg v. People's Nat'l Bank of Washington,* 88 Wash.2d 595, 564 P.2d 1137 (1977).

In other words, the mere breach of a contract between P and D may not supply grounds for a tortious interference action, even if P's relationships with T are, to some degree, adversely affected. But if the breach is attended by "improper conduct," the action will lie. Certainly, if D's breach and subsequent unlawful conduct is attended by "malice," P should be able to recover.

For purposes of the interference tort we are discussing, "malice" does not always have to be actual malice or ill will. Although mere breach of a contract is not enough, "malice" may, in proper circumstances, consist of "the intentional doing of a wrongful act without legal justification or excuses." *Cumberland Glass Mfg. v. DeWitt,* 120 Md. 381, 392, 87 A. 927, 931 (1913), *aff'd,* 237 U.S. 447, 35 S.Ct. 636, 59 L.Ed. 1042 (1915).[3] I need not dwell, however, on nice distinctions between different varieties of malice. The act of conversion was accompanied by circumstances that permitted the jury, in my view, to find actual malice; that same malice is present for purposes of tortious interference. I think there was enough evidence of malice to go to the jury.

Actual malice "has been characterized as the performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and wilfully injure the plaintiff." *H & R Block v. Testerman,* 275 Md. 36, 44–45, 338 A.2d 48, 53 (1975). I agree with the majority "that proving actual

---

3. For a comprehensive treatment of the various aspects of malice in the context of tortious interference with economic relations, see *Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 71–72, 485 A.2d 663, 675 (1984).

malice, as we have so characterized it, is sometimes an onerous burden," and that in this case, "there is no direct evidence of actual malice." *K & K*, 316 Md. at 175, 557 A.2d at 984. I also agree, however, that actual malice can be inferred from circumstantial evidence. *Id.* at 175, 557 A.2d at 984. In *Henderson v. Maryland Nat'l Bank*, 278 Md. 514, 520, 366 A.2d 1, 4 (1976), we recognized that "[i]n the commercial sphere, ... where an impersonal relationship is more likely to prevail, such emotions as anger or spite are not always vented in a direct manner, and not infrequently find their expression in the facts and circumstances surrounding the tortious conduct."

*Henderson* involved a plaintiff who had brought a conversion claim against Maryland National Bank for its repossession of his automobile. Prior to the repossession, a series of clerical errors by the bank produced erroneous payment delinquency notices which Henderson attempted to correct by telephone calls and by submitting photocopies of cancelled checks. The bank remained adamant and eventually one of its employees, in an angry telephone conversation, demanded that Henderson bring all of his relevant records from his Virginia home to the bank's Maryland office. When Henderson declined the invitation, the bank repossessed the car without further notice. We concluded that under the circumstances there was a permissible inference that the repossession was undertaken not to obtain payment on behalf of the Bank, but instead was provoked by anger or a desire to punish Henderson for refusing to produce the records.

The inquiry, here, as in *Henderson*, is whether the Lees presented sufficient circumstantial evidence of malice to allow the jury to consider the tortious interference claim. It is unnecessary to examine any evidence presented by K & K that may have been introduced to negate an inference of actual malice. *Henderson*, 278 Md. at 520–522, 366 A.2d at 5–6. One needs to ask only whether the jury could draw a reasonable and probable inference of malice from the evidence presented by the Lees. *Id.* at 520, 366 A.2d at 4–5.

According to the testimony of Mr. Lee and his daughter, Kim, the year preceding the closing of the restaurant involved many instances of difficulty with the Kirbys and K & K. While the Lees' testimony attempted to characterize these difficulties as harassment by K & K, none of this testimony alone gives rise to a reasonable inference of actual malice. What is determinative, however, is the manner in which the restaurant was closed and the property converted, and the direct impact this had on the Lees, their reputation in the community, and their business relations with Korean individuals and groups. This evidence I view in the context of the history of earlier difficulties, including that pertaining to possible racial or ethnic bias.[4]

Robert Kirby, Jr., an adverse witness, testified that sometime after midnight on 7 September 1983, he and his brother, Phillip, arrived with a locksmith to change the exterior locks on the restaurant doors. The locks were changed and a sign put up stating that the restaurant was temporarily closed. He testified that no attempt was made to determine whether there were any activities, gatherings, or reunions planned to take place in the restaurant which would be disrupted by the abrupt closing. He further testified that a letter had been prepared for Mr. Lee which stated that the contract was terminated. The letter offered as a basis for the termination the fact that the Lees had allegedly fired an employee because she was pregnant—an action that K & K claimed violated certain contractual provisions.

Mr. Lee in his testimony described what he had found on his arrival at the restaurant on the morning of 7 September:

---

4. The majority is skeptical about the claim of racial or ethnic bias, the only direct evidence of which has to do with an occasion upon which the motel manager, Mr. Dahlseid, told a group of Koreans not to sit in the motel lobby. *K & K*, 316 Md. at 170, 557 A.2d at 981. It rejects this evidence because of the general tenor of the relationship between K & K and the Lees. Racial and ethnic prejudice, however, is often concealed nowadays and for that reason can manifest itself at times and in ways that may appear on the surface as surprising. I would leave to the jury the question of whether this was a factor in K & K's conduct.

the locks changed;  the letter declaring the contract terminated.  He explained he was permitted to enter the restaurant to remove only personal belongings and a few other items.  As the majority noted, the Kirbys specifically instructed Mr. Lee that he could not remove any items purchased through the business accounts.

Mr. Lee went on to challenge the legal basis for the closing.  He testified that the pregnant employee was not fired but had voluntarily left their employ.  This was corroborated by his daughter, Kim, who testified that the employee left because of the employee's concern about the strenuousness of the work she was required to perform and the impact this may have on her carrying the child to term.  The employee's concerns, Kim testified, were fostered by a previous miscarriage.  The Lees also introduced evidence that the closing violated the contract in that K & K did not provide 30 days notice before terminating the Agreement.  The contract, which was introduced into evidence, conditioned K & K's right to terminate the contract, in the event of the Lees' breach of any terms or conditions, on the giving of 30 days notice.

There was extensive evidence presented by the Lees as to their reputation and standing in the Korean community.  Apparently, the Seoul Restaurant had become a meeting place for many Korean organizations, including the Korean Society of Greater Baltimore, the Korean Businessmen's Association, and the Korean Women's Organization.  When the restaurant closed, many meetings regularly held at the Seoul Restaurant had to be rearranged.  There was evidence that the Lees suffered great distress and embarrassment because of this disruption in their business.  Additionally, there was testimony that the Lees' standing among the Korean organizations suffered as well.  Mr. Pak, a former president of both the Korean Businessman's Association and the Korean Society of Greater Baltimore, testified that within the Korean community, Mr. Lee was blamed for the restaurant's closing because of his alleged firing of the pregnant employee.

K & K, of course, presented evidence that tended to support its theory that it was not required to give advance notice of termination of the contract, and that closing the restaurant in the middle of the night was designed to minimize inconvenience to customers. The jury, however, was not required to believe this testimony and apparently did not. From the evidence presented, the jury could reasonably have concluded that K & K had no legal justification for terminating the contract, and that its motivation was something other than enforcement of a contractual right.

When it found for the Lees on the conversion claim, the jury necessarily found that K & K had no ownership interest in the converted personalty. The majority observes, with regard to the conversion, that "[f]rom K & K's standpoint the record *at best* presents a contractual ambiguity with factual issues bearing on the interpretation of the Agreement." *K & K*, 316 Md. at 173, 557 A.2d at 982 [emphasis supplied]. I submit that the record, without its "best" face towards K & K, shows a conversion brought about by a bad faith construction of the Agreement, motivated by greed, anger, or a desire to punish the Lees. In my view, no reasonable interpretation of the contract exists which could possibly establish K & K's interest in the personalty in question. Consequently, the evidence showed K & K was fully aware it was taking property to which it had no legal claim. That greed may have been the motivation is obvious. But K & K's conduct is also consistent with the Lees' assertion that the sudden seizure and conversion of the property was carried out to maximize injury to the Lees; in essence, to punish them.

I disagree with the majority's conclusion that "taking all of the inferences which may reasonably be drawn from the evidence most favorable to the Lees, K & K's " 'object was merely to benefit itself.' " *Id.* at 177, 557 A.2d at 985 (quoting *Knickerbocker Ice Co. v. Gardiner Dairy Co.*, 107 Md. at 569, 69 A. at 410). What I have already recounted with regard to the closing of the restaurant, and from

which I believe the jury could have drawn an inference of malice, has equal bearing with respect to the conversion. It is undisputed that the relationship between K & K and the Lees was substantially strained for a year prior to the closing of the restaurant in September 1983. The majority recounted some instances of disagreement. *K & K*, 316 Md. at 145, 557 A.2d at 969. From K & K's perspective the Lees were uncooperative. They did not respond sufficiently to numerous complaints about their food service. They failed to conform their conduct to the Agreement. They failed to prepare group menus, despite K & K's repeated requests, causing the motel to forego bidding on certain group tours. Kim Lee testified that Mr. Dahlseid, K & K's on-site manager, complained to them about the restaurant operation that "everything is just being done wrong." There was also testimony regarding tense and angry moments between Robert Kirby, Sr., and Mr. Lee as well as between Mr. Dahlseid and Kim Lee. Thus, like this Court's determination in *Henderson, supra,* I believe there is sufficient circumstantial evidence from which the jury could infer that the conversion was motivated by anger or a desire to punish.

In sum, the evidence, taken in the light most favorable to the Lees, permits the inference that the steps taken to close the restaurant *and* to convert the assets were with the intent to maximize injury and embarrassment to the Lees. That inference is enough to support a finding of actual malice and thus improper conduct sufficient to support the tortious interference count.

## II.

As to the conversion claim, as I have noted, my only difference with the majority is on the punitive damages issue. I agree that the conversion claim is one involving a tort arising out of contract. I also agree that in such a case, "punitive damages are recoverable only where the

plaintiff establishes actual malice." [5] *Id.* at 175, 557 A.2d at 983. For the reasons I have just stated in connection with the tortious interference claim, I believe there was enough circumstantial evidence of actual malice to go to the jury. Therefore, it was appropriate to submit the punitive damages question to the jury.

### III.

Because I would affirm the judgment as to both tortious interference and punitive damages for conversion, I must address those contentions of appellants that the majority has not discussed. I shall assume that these contentions were preserved.

### A.

### 1.

With respect to the tortious interference count, K & K raises the affirmative defense of privilege. It argues that liability for interference cannot lie where the alleged interferer is a financially interested party whose motivation stems from protection of that financial interest. K & K primarily relies on *United Rental Equipment v. Potts & Callahan*, 231 Md. 552, 560, 191 A.2d 570, 574 (1963), wherein we quoted with approval Restatement of Torts § 773:

> One is privileged purposely to cause another not to perform a contract, or enter into or continue a business relation, with a third person by in good faith asserting or threatening to protect properly a legally protected interest of his own which he believes may otherwise be impaired or destroyed by the performance of the contract or transaction.

---

**5.** The wisdom of this rule has been questioned. *See, e.g., Miller Building Supply v. Rosen*, 61 Md.App. 187, 201, 485 A.2d 1023, 1030 (1985) (Adkins, J., concurring). It is, nevertheless, firmly established. *See, e.g., Miller Building Supply v. Rosen*, 305 Md. 341, 503 A.2d 1344 (1985). The rule is not questioned in this case.

K & K concludes that "to the extent that K & K or the Kirbys individually interfered with the Lees' contracts with others by terminating the management agreement, such interference resulted only from the assertion by appellants of ' "a legally protected interest of [their] own." ' " Appellants' Brief p. 27 (quoting *United, supra,* bracketed portion inserted by Appellants).

Had K & K's conduct gone no further than termination of the contract, I might be persuaded that the resultant interference was privileged. The argument, however, neglects to consider that conduct which went beyond breach of the contract. The right to interfere accorded by the privilege doctrine simply cannot be construed as encompassing, in this instance, the wrongful conversion of the Lees' property and the other evidence of improper conduct. If privilege existed at all, it did so only to the extent of the termination of the contract. Accordingly, I would hold that the trial court did not err in refusing to instruct the jury on privilege, nor did it err in denying K & K's motion for judgment on the basis of privilege.

2.

Then Lees successfully asserted a tortious interference claim against the individual Kirbys as well as against K & K. I turn now to that claim. The interference claim against the Kirbys and the one against K & K are virtually identical. As with the argument on behalf of K & K, the Kirbys characterize the act of interference as a single wrong—the act of closing the restaurant without notice. Once again, this ignores the fact that the Lees' claim also alleged that the Kirbys interfered by converting the Lees' property.[6]

The Kirbys were not, of course, parties to the contract between K & K and the Lees. Thus, they cannot successfully raise the argument that a party to a contract cannot

---

6. While the Lees originally brought claims against both K & K and the Kirbys for conversion, the conversion claim against the Kirbys was dropped during trial.

be sued for tortious interference arising from a breach of that contract. Their exposure to the tortious interference claim, if any, derives from wrongful acts independent of any breach of contract—chiefly, the conversion of the Lees' chattels and the lockout, considered in the context of the general relationship between the parties. I dealt with this theory in the claim against K & K and the same reasoning applies. I will, however, touch briefly upon the Kirbys' challenge to the permissibility of piercing the corporate veil to hold them individually liable.

In essence the argument is that there was no evidence that the Kirbys did other than terminate the corporation's contract with the Lees, and, therefore, the inquiry is limited to whether the corporate veil could be pierced on the basis of this termination—an inquiry the Kirbys answer in the negative. As with their other arguments, this one is dependent on the incorrect assumption that the interference claim was predicated solely on the termination of the contract. Indeed, the Kirbys go so far as to concede that they "do not quarrel with the proposition that corporate officers may be personally liable for tortious conduct they commit *separate and apart* from acting as the corporation's agents in terminating the contract." [Appellants' Reply Brief, p. 23, emphasis in original.] Their concession is correct. This Court has indicated that individual tort liability may attach where a corporate officer's actions involve separate tortious conduct. *Bart Arconti & Sons v. Ames–Ennis*, 275 Md. 295, 312, 340 A.2d 225, 235 (1975). Here, of course, there was a separate tortious act—the conversion of the Lees' property. As I have explained this was independent of the termination of the contract. Consequently, I think the concession makes evident there is no real corporate veil question at issue. Once it is understood that the proper focus is on the conversion as the wrongful conduct in question, the argument becomes irrelevant.

The Kirbys do, however, raise a final challenge to the interference claim that was not raised by K & K and is not dependent on the termination of contract theory. The Kir-

bys assert that even if their conduct is found to be tortious, there is insufficient evidence of actual malice to support the verdict against them.

The response lies in what I have already said on this topic. The same evidence that supports the award of punitive damages under the conversion count supplies sufficient evidence of malice to carry to the jury the tortious interference count against the Kirbys. It was they who directed and carried out the conversion. There was sufficient circumstantial evidence from which malice could be inferred, therefore, to allow the jury to consider the interference with business claim against the Kirbys.

### B.

K & K also asserts error with regard to the sum of certain compensatory damage awards, charging the trial court with error in allowing multiple damage awards to be made based on the same acts and injuries.[7] K & K first raised the double recovery challenge in a Rule 2–523 motion for new trial. In reviewing a denial of motion for new trial, abuse of discretion is the appropriate standard. *Miller Building Supply v. Rosen,* 305 Md. 341, 355, 503 A.2d 1344, 1351 (1986).

I agree with K & K that " 'the law does not permit a double satisfaction for a single injury.' " *Montgomery Ward & Co. v. Cliser,* 267 Md. 406, 425, 298 A.2d 16, 26 (1972) (quoting 25 C.J.S. *Damages* § 3). I also agree that the jury instructions on the measure of damages as to each cause of action were not exemplars of clarity and precision. The instructions, as given, were susceptible to an interpretation which could have produced duplicating awards. The jury could have awarded consequential damages for lost

---

7. The potential for overlap exists only in the compensatory awards for breach of contract and interference with economic relations. K & K's arguments concern only this possibility. Quite clearly there was no overlapping of punitive damages. No more than one punitive damage award was assessed against each defendant.

profits on either the breach of contract or interference with economic relations claims or both, but apparently it did not.

The jury awarded $93,000 as compensatory damages for breach of contract. This figure is nearly identical to expert trial testimony which fixed lost profits at $92,340. On the conversion claim the jury awarded compensatory damages of $14,400. At trial it was submitted that the actual cost of the converted property was $24,640. It is asserted that the compensatory award reflects actual cost less depreciation. I observe that the amount of the award is considerably less than the total cost of the property as claimed by the Lees and may very possibly take into account the property's depreciation. In looking at each of these awards, it appears that the jury responded directly to the specific monetary figures given in evidence as to the corresponding claims. On the other hand, the Lees introduced no evidence which attached a specific monetary figure to the interference claim. The compensatory awards for interference with economic relations were round figures of $100,000 for Chul Woo Lee and $100,000 for his wife, So Jae. Given these outcomes, I believe it is more than likely that the jury properly understood its task and refused the invitation to overlap damages.

As recounted earlier, the Lees presented extensive evidence concerning the severity of their emotional, mental, and reputational injuries. Of course, none of these injuries is compensable in suit for breach of contract. They are, however, compensable injuries on a cause of action in tort. The $200,000 in compensatory damages awarded in total to the Lees on the interference claim seems to bear little relation to the $93,000 awarded for breach of contract. Rather, the nature of the number suggests it is the jury's assessment of the compensation due the Lees for those injuries (mental, emotional, and reputational) which were not directly or readily quantifiable. Undoubtedly, when the jury awarded the $100,000 each to the Lees it was well aware that it had, in a preceding question on the verdict sheet, already compensated the Lees for all projected lost

profits in the amount of $93,000. I think it unlikely, then, that the jury took a second account of this financial injury in calculating the compensatory damages for interference. Certainly, the possibility of such an overlap is not so great that I could say the trial court abused its discretion in refusing to grant the motion for new trial.

Moreover, I take note of the fact that K & K could have dealt with this potential problem by requesting specific jury instructions delineating the compensable injuries on each cause of action, so that there would have been little or no likelihood of overlapping awards. K & K simply did not request instructions of this sort. As to the breach of contract instruction, K & K objected only to the court's failure to instruct the jury on its theory that compensatory damages should be limited to those incurred within 30 days of the breach. As to the instruction on interference with economic relations, there was no defense objection to the content of the measurement of damage portion of the instruction.

In reviewing a motion for a new trial, this Court has previously considered a defendant's failure to request a protective jury instruction on an issue subsequently raised in a new trial motion as weighing in favor of finding no abuse of discretion in the trial court's denial of that motion. *Brinand v. Denzik*, 226 Md. 287, 292–293, 173 A.2d 203, 206 (1960). Thus, K & K's failure to request jury instructions, which could have substantially reduced or eliminated the potential for a double recovery, undergirds my view that there was no abuse of discretion in denying the motion for new trial.

## IV.

For the reasons I have stated, I would affirm the judgment of the trial court.

COLE, J., has authorized me to state that he concurs with the views expressed herein.