*Donegal Associates v. Christie-Scott LLC*, No. 385, September Term, 2019.  Opinion by Graeff, J.

**PROPERTY — LANDLORD-TENANT — TORTS — CONVERSION OF PERSONALTY — SELF-HELP EVICTION**

Conversion is an intentional tort consisting of any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his or her right or inconsistent with it.  Conversion may be either direct or constructive.  In a direct conversion, the initial taking is unlawful.  Constructive conversion occurs when the defendant's possession is initially lawful, but there is a wrongful detention.  To establish a constructive conversion, the plaintiff must show that he or she demanded the return of the property, and the holder refused.

A commercial landlord is permitted, although it is not encouraged, to resort to self-help to repossess premises and property within the premises in the following circumstances: (1) the tenant is in breach of a lease; (2)  that authorizes the remedy of repossession; and (3) the repossession can be done peacefully.  In this case, those circumstances were satisfied, and therefore, the initial taking was lawful and there was no direct conversion of the property seized.  Constructive conversion was not shown where there was no demand made prior to filing suit for conversion.  To establish a claim for constructive conversion, a pre-lawsuit demand and refusal is required.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 385

September Term, 2019

_____

DONEGAL ASSOCIATES, LLC

v.

CHRISTIE-SCOTT, LLC

_____

Graeff,
Arthur,
Woodward, Patrick L.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Graeff, J.

_____

Filed:  November 19, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

In 2005, Christie-Scott, LLC ("Christie-Scott"), appellee, purchased Victoria & Albert Hair Studios and assumed the salon's lease with the landlord, Donegal Associates, LLC ("Donegal"), appellant. In October 2016, the commercial lease ended. Christie-Scott remained in the space and continued to pay rent, while the parties engaged in negotiations regarding a new lease. In June 2017, Christie-Scott notified Donegal that it did not intend to renew the lease because it was moving the business to another location.

On November 6, 2017, Donegal repossessed the property. The following day, Christie-Scott filed a complaint in the Circuit Court for Howard County. On May 2, 2019, the circuit court issued an order finding Donegal liable for conversion of appellee's property, and it awarded Christie-Scott $139,938.87 in compensatory damages, minus unpaid rent, for a total of $96,633.96. The court also awarded Christie-Scott $1,000,000 in punitive damages.

On appeal, Donegal presents the following questions for this Court's review, which we have reordered, as follows:

1. Where a commercial landlord has a contractual lien on personalty, can it be liable for conversion of such personalty if the tenant produces no evidence showing that it made a demand for its return and that the landlord refused such demand?

2. When, in violation of Md. Rule 2-305, a plaintiff omits in its complaint the amount of alleged compensatory damages, and the defendant's trial strategy relies on that pleading, may that plaintiff retain excess damages awarded by waiting until the third day of a four-day trial to purport to amend its complaint, without leave of the court, to increase the amount of damages sought?

3. Did the circuit court err in awarding compensatory damages for loss of use on a conversion claim when (a) Christie-Scott designated three experts on damages, never proffered their testimony, and offered only

incompetent and speculative law testimony; and (b) the court relied solely on an exhibit prepared by Christie-Scott in anticipation of litigation and without foundation, in violation of Md. Rule 5-803(b)(6)?

4.      Did the circuit court err in awarding punitive damages of $1,000,000 based on Donegal's exercise of the right to peaceable self-help in repossessing its premises, when (a) such a right was expressly available to Donegal, a commercial lessor, under the Lease and at common law; (b) Donegal effected repossession for business purposes and there was no actual malice; and (c) the court ignored state and federal constitutional limits on punitive damage awards?

For the reasons set forth below, we shall reverse the judgment of the circuit court and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2005, Christie Kaier and Scott Schmidt, through Christie-Scott, LLC, purchased Victoria & Albert Hair Studio in Columbia, Maryland from the previous owners and assumed the commercial lease with Donegal.[1]  Christie-Scott continued to operate and grow the hair salon business for the next twelve years, during which time the parties had an amicable relationship and renewed the lease multiple times.

The parties' commercial lease expired on October 31, 2016.  Prior to that time, Christie-Scott began negotiating the terms of a new lease with Donegal through its property management company, identified as JLL.  Christie-Scott had concerns regarding needed renovations and safety issues due to the declining character of the neighborhood, which had resulted in non-customers loitering, panhandling in the parking lot, and coming inside

---

[1] Ms. Kaier and Mr. Schmidt were both long-time employees of the salon when they purchased it from the owners.  Ms. Kaier handled the administrative side of the business, while Mr. Schmidt, a hair stylist, handled the hiring and training of new staff.

2

to use the bathrooms or the phone.  The parties discussed potential renovations and efforts to eliminate uninvited pedestrian traffic, with Donegal bearing $50,000 of the cost and the balance to be covered by Christie-Scott and amortized in subsequent lease payments. Donegal began commissioning renovation plans at its own expense.

When the lease expired on October 31, 2016, Donegal permitted Christie-Scott to remain in the space on a month-to-month basis while the lease negotiations continued, but there was no oral or written agreement to this effect.  The lease provided as follows:

5. TERM AND TERMINATION:

A.  The Term shall begin on the Commencement Date and unless extended or renewed shall end without notice at midnight on the Termination Date. Tenant agrees to vacate the Premise at the end of the Term and that Landlord shall be entitled to the benefit of all summary proceedings to recover the possession of the Premise at the end of the Term as if statutory notice had been given.

\*        \*        \*

C.   If Tenant remains in possession of the Premises after the expiration of the Term, the Term shall not automatically renew by operation of law, and Landlord may consider Tenant as a Tenant-at-Will liable for the payment of Rent at the market rate as determined by Landlord or may consider Tenant as a "Tenant Holding Over" liable for double the market rate of Rent.  In either event, all other covenants of his Lease shall remain in full force and effect.

Christie-Scott continued to pay the same amount of rent during this period, but it did not pay real estate taxes or Common Area Maintenance ("CAM") fees.  Donegal did not communicate whether it considered Christie-Scott a holdover tenant or a tenant-at-will, but it billed Christie-Scott the same amount of rent, and it continued to deposit the rent payments.

3

On December 8, 2016, JLL's agent, Bill Hearn, sent an e-mail to Jim Greenfield and John Healy, the managing partners at Donegal, regarding discussions with Christie-Scott concerning the expiration of its lease and renewal. Mr. Hearn asked whether Donegal wanted JLL to begin charging the salon double "holdover rent" or "continue charging the most recent rent without increase." Mr. Healy and Mr. Greenfield both responded that they would like to "continue charging the normal monthly rent until further notice."[2]

While the lease negotiations were ongoing, Christie-Scott was privately contemplating moving the business due to the declining character of the neighborhood and the resulting safety issues. In February 2017, it began researching new locations. In March 2017, Ms. Kaier called a staff meeting to discuss whether to find a new location or move ahead with fixes to the current one, and the employees unanimously voted to move to a new location. Christie-Scott settled on a location in Clarksville, secured a bank loan, and in June 2017, it signed a lease for the new space. A few days after the company signed the lease, Ms. Kaier contacted Mr. Hearn and informed him that the salon was not going to stay at Donegal's property, and they would be moving by November 1, 2017.[3]

---

[2] The e-mail stating Mr. Healy's agreement to charge the normal rent was sent by his wife, Charlotte Healy, because Mr. Healy did not use e-mail. Charlotte Healy, in addition to being a limited partner at Donegal, also was a frequent customer at Christie-Scott's salon.

[3] At some point, Christie-Scott requested an extension until February 2018. The record reflects that the availability of the Clarksville location was delayed by permitting and construction problems.

A few days later, on June 30, 2017, JLL sent a letter to Christie-Scott, stating that Donegal considered the salon to be a holdover tenant in accordance with Section 5C of the lease. It demanded immediate payment of double rent dating back to the expiration of the lease on October 31, 2016, a total of $75,939.76.[4]

After that letter, until October 2017, Christie-Scott remained in the space and continued to pay only the normal rent amount, which Donegal deposited. Christie-Scott made repeated requests for a face-to-face meeting with Donegal during this period, but no such meeting occurred.

During the summer of 2017, Mr. Healy was approached by Dwight Platt, another commercial real estate owner, who offered to purchase the building from Donegal. Mr. Platt told Mr. Healy that he recently had sold a building in Baltimore County and needed to "park" the profits in another real estate investment by December for tax purposes.[5] Donegal agreed to sell, with the condition that they close by December.

On September 8, 2017, Donegal filed, in the District Court for Howard County, a complaint for repossession of rented property due to non-payment of rent by Christie-Scott.

---

[4] The rent prior to November 1, 2017, pursuant to the lease, was $9,492.47 per month. Ms. Kaier testified, and statements from Donegal confirm, that prior to the letter, from November 1, 2016 to June 2017, she had been billed for the regular rent, which she paid, and Donegal cashed the checks.

[5] In its brief, Donegal cites Section 1031 of the Internal Revenue Code, which allows sellers of real property to avoid capital gains taxes if they reinvest (or "park") the proceeds in another piece of similar real property within 180 days after the sale. This procedure was not explicitly discussed at trial, but Mr. Healy testified that Mr. Platt needed to park the money and close by December for tax reasons.

Trial was set for October 13, 2017, but it was postponed twice, once because of a scheduling conflict and a second time because the assigned judge recused herself due to a conflict of interest with Mr. Healy.

The trial was reset for November 9, 2017. Donegal, however, decided to pursue the nonjudicial remedy of self-help.

Section 24A of the parties' commercial lease provided that, if Christie-Scott breached "the covenant to pay Rent by failing to pay rent or all other sums of money which may be considered Additional Rent when due," Donegal was permitted to take any of the following actions:

> (a) Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord; but if Tenant shall fail to do so, Landlord may, without further notice and without prejudice to any other remedy Tenant may have for possession or arrearages in Rent, Additional Rent or damages for breach of contract, enter upon the Premises and remove Tenant and his effects by force if necessary, without being liable to prosecution for any claim of damages[.] . . .
>
> (b) Enter the Premises as the agent of Tenant, by force if necessary, without being liable to prosecution or any claim for damages and relet the Premises as the agent of the Tenant and receive the Rent therefor[.] . . .
>
> (c) Perfect and otherwise enforce a lien, which Tenant agrees that Landlord shall have, on all personal property, fixtures and trade fixtures of Tenant, presently existing or subsequently acquired, placed in the Premises by or for the benefit of the Tenant and may without notice and without liability to Tenant or other party be sold by Landlord at public or private sale with the proceeds being applied to amounts owed by Tenant and toward damages resulting from Tenant's breach of this Lease.

On October 31, 2017, Donegal called a meeting to inform Mr. Hearn that it intended to seize possession of the salon through self-help on Monday, November 6, 2017, and "lock

6

out the [t]enant."[6] It selected this date because the salon is closed on Mondays. At the meeting, Mr. Healy expressed frustration at the slow pace of the litigation in the District Court and believed that, "as a result of Donegal's interpretation of the lease language and legal statutes," repossession was permissible at that time. Donegal instructed JLL to coordinate changing the locks and hiring security to keep the premises "secure from the tenant." Donegal's attorney advised Mr. Hearn that "all hair salon product on site will become property of the landlord."

JLL was opposed to this action because it believed it "bypassed" the judicial process pending in District Court, and it advised Donegal to consider other options. When Donegal declined to do so, JLL refused to participate in the repossession and terminated its management agreement with Donegal.

On the morning of November 6, 2017, three days before the District Court hearing was scheduled on Donegal's repossession action, Mr. Healy went to the salon with Donegal's attorney, a locksmith, and a security guard, and they changed the locks and alarm codes on the doors. No advance notice was provided to Christie-Scott. The salon was closed that day, but one of Christie-Scott's employees was present at the salon doing inventory when the repossession took place. Donegal's attorney asked her to gather her belongings and leave, which she did. The employee called Ms. Kaier to inform her what

---

[6] The information regarding this meeting was memorialized in a November 1, 2017, e-mail from JLL's regional director, Tim Hearn (Bill Hearn's brother), to Donegal's attorneys. The e-mail was introduced at trial through Bill Hearn, who was cc-ed on the e-mail.

7

had happened, but by the time Ms. Kaier got there from her home 45 minutes away, Donegal and its agents were gone.[7]

The stylists were permitted to enter the space a few days later, under the supervision of Donegal's attorney, to retrieve their personal items and professional "tools," such as hair dryers, brushes, curling irons, etc. Donegal's attorney also returned some of Ms. Kaier's and Mr. Schmidt's personal items to them. Ms. Kaier, Mr. Schmidt, and their employees were otherwise unable to access the salon to retrieve or take stock of any additional items. As a result of the loss of the space, all but three of Christie-Scott's hair stylists quit to find other jobs.

On November 7, 2017, the day after the lockout, Christie-Scott filed a complaint against Donegal in the Circuit Court for Howard County, alleging, among other things, wrongful eviction, trespass, conversion, and tortious interference with a contractual right. In its closing argument, Christie-Scott effectively abandoned all counts except conversion.[8] Accordingly, only that claim and Donegal's two counterclaims were submitted to the court for consideration. As relevant to the conversion count, the complaint included an *ad damnum* clause requesting "judgment against [Donegal] for compensatory damages in an amount in excess of the minimum jurisdictional amount of the Circuit Court, plus punitive damages of five million dollars ($5,000,000)[.]"

---

[7] On November 8, 2017, Donegal filed a motion in the District Court advising that its previous repossession action was moot.

[8] Counsel noted that the trespass to land (Count III) was a factual prerequisite for the conversion claim, but Christie-Scott was not seeking separate damages on the trespass count.

On the same day that Christie-Scott filed its complaint, it filed a motion for a temporary restraining order ("TRO") and preliminary injunction to enjoin Donegal from continuing the lock-out and to restore possession to Christie-Scott. On November 8, 2017, the court granted the motion for a TRO. On November 28, 2017, following a hearing, the court vacated its Order granting the TRO.

On May 16, 2018, Donegal filed a counterclaim. Count I alleged breach of the lease agreement by failing to pay rent as a tenant holding over since November 1, 2016, resulting in damages in excess of $155,000. Count II alleged misrepresentation regarding Christie-Scott's intent to renew the lease. It requested "an amount in excess of $75,000" in compensatory damages and the same for punitive damages.

Both parties subsequently filed motions for summary judgment. On April 2, 2019, after a hearing, the court issued an order denying both motions, with the exception that it granted judgment in favor of Donegal on Count VI of Christie-Scott's complaint (tortious interference with a contractual right).

A four-day bench trial began on April 15, 2019. Ms. Kaier testified that she began working at the salon in 1990, and her responsibilities grew until she became the manager. In 2005, after obtaining a loan for one million dollars, she and Mr. Schmidt purchased the salon. Ms. Kaier testified that she did not intentionally keep Donegal in the dark about Christie-Scott's plans to relocate to Clarksville, but she did not finalize the decision to move until June. Within days of signing the lease, she advised Mr. Hearn.

Ms. Kaier had no notice that Donegal was going to change the locks. After the lockout, she struggled to keep the business afloat, but she was able to find a temporary

9

location to continue operations. She did not remove items contained in the store at the time of the lockout, with the exception of some personal items. With regard to the business records, Ms. Kaier testified that she had online access to the salon's client lists, client appointments, some employee records, the check register, and product lists, but she could not access contracts, invoices, or receipts remotely.

Christie-Scott introduced Plaintiff's Exhibit 5, an inventory list of all the retail products that were in the store at the time of the lockout.[9] Retail products are items that customers purchase for home use, as opposed to professional products, which are used on the clients when they come in for services. The retail value of the 2,719 retail products listed on Exhibit 5 was $113,917.24.

Christie-Scott also introduced Plaintiff's Exhibit 6, an undated inventory list of the professional products in the salon, but Ms. Kaier conceded that it was made from memory, and she did not know the actual quantity because she had not been able to access the space to inventory what had been used since the last weekly order. The professional products inventory was itemized, but it did not include a total dollar amount for the products. Ms. Kaier testified that, on average, she ordered $2,000–$2,500 of professional products each week.

Ms. Kaier further testified that, in addition to the retail and professional products, there were numerous pieces of furniture, fixtures, equipment, and business records still

---

[9] Ms. Kaier was able to access this list remotely. She testified that it had a print-out date of March 19, 2018.

locked in the space, a "good portion" of which she had intended to transport to the new location. She acknowledged, as did Mr. Schmidt, that some of the furniture was old and would not have gone to the new location.

Christie-Scott also introduced numerous receipts and bank statements to establish damages for some of the moveable items, such as the salon chairs, the furniture in the reception area, a refrigerator, two washers and dryers, trollies, and more. Ms. Kaier testified that the salon might never financially recover due to the additional debt it incurred to buy all new items for the Clarksville space.

Ms. Kaier also discussed Plaintiff's Exhibit 13, a list of the items that she was able to recall that were left in the salon at the time of the lockout. This list included retail products, furniture, equipment, and fixtures, which counsel stated "was the best evidence" they had because Ms. Kaier had not been able to get into the space. The court admitted the exhibit "for what it's worth subject to cross-examination."[10]

Maggie Frantz, the sole employee present on the day of the lockout, testified that Mr. Healy, an attorney, a locksmith, and an officer came into the salon while she was doing inventory. They told her that "they were [there] to do a peaceful eviction," and she needed to grab her belongings and leave. She described the interaction as follows: "I just, I was kind of confused as to what was happening. I was pretty intimidated at the time I was twenty-two years old, so, I just was a little I guess confused as to what was happening."

---

[10] The total of the items was $221,760.

She testified that, after she exited, Mr. Healy "did try to come outside and console me almost a little bit."

Mr. Hearn, Donegal's commercial property manager at JLL, testified regarding the lease renewal negotiations with Christie-Scott. He stated that, when he informed Mr. Healy that Christie-Scott intended to move, Mr. Healy was not visibly angry or upset, but he was concerned and determined. When Donegal advised that it intended to evict Christie-Scott, JLL refused to participate in the lockout, and it terminated its management agreement with Donegal.

Donegal called several witnesses relating to comments made by Mr. Schmidt referencing "squatters." Christine Hoffman and Christy Murphy testified that, during a staff meeting, there was a concern that Christie-Scott had given notice that they would be moving in November, but Donegal may not allow them to do that. They testified that Mr. Schmidt stated that it was fine, they were "going to be squatters," and there was nothing the landlord could do. Mr. Schmidt denied saying this, but he agreed that the plan after signing the new lease was to stay at Donegal's property on a month-to-month basis until the Clarksville location was ready. Several other employees testified regarding Mr. Schmidt's mention of the word "squatters" at an October 2017 staff meeting, but some believed it to be a joke.

Karen Bosley, a former stylist with Christie-Scott, testified that she left immediately after the lockout to work for a different salon. Shortly thereafter, she received a phone call from Charlotte Healy, Mr. Healy's wife and business partner at Donegal, offering her the opportunity to work out of the locked space. Ms. Bosley attempted to recruit the other

12

former Victoria & Albert stylists to come work for her, but none of them accepted her offer. Although Christie-Scott did not provide her with her client list, Ms. Bosley briefly ran operations out of the space with a business partner until she took a leave for surgery in January 2018.

Charlotte Healy testified that, after the lockout, she acted on behalf of Donegal to clear the space to "set it up for another salon." She stated that she sold some product to individuals from other salons that came and "knocked on the door" to see what was available. She sold the items for a nominal fee, for a total profit of approximately $4,000. The items were not posted online or advertised publicly, and some were thrown away or donated. Other than the items sold, she did not remove any supplies, equipment, furniture, or records from the salon's office, stating that they were still in the space at the time of trial. Unsold items were left on the premises, and she did not keep a record of what was sold.

Christie-Scott introduced Plaintiff's Exhibit 24, an inventory list, prepared on February 9, 2018, by Donegal's consultant, of the remaining furniture, equipment, and other fixtures in the salon. The inventory list reflected a total estimated market value of $32,645.11, with an estimated market value of sold items in the amount of $6,623.48. The list was admitted over Donegal's objection that it was work product of its hired consultant.

John Healy testified as the corporate designee for Donegal. He decided to consider Christie-Scott a holdover tenant after the salon notified him that it would be moving, but this was a business decision. He proceeded with the lockout instead of waiting for the District Court proceedings to go forward because he had an agreement to sell the property

13

to Mr. Platt by December, and he was concerned that Christie-Scott would not vacate in time. Donegal decided to sell the building in part because he and Mr. Greenfield were in their 80s, and there was no one willing and able to inherit the business from them.

Mr. Healy testified that he permitted Ms. Bosley to operate out of the space in the days following the repossession because it allowed him to mitigate his damages and to avoid spending money to renovate the property back to office space. He and Ms. Bosley orally agreed that Donegal would defer six months of rent to give her an opportunity to get the business off the ground, and after that period, they would reevaluate the next steps.

Additionally, they agreed that Ms. Bosley would sell and use the products left in the space by Christie-Scott, and that she would give money from the sales to Donegal. Those monies would then be offset against the claim against Christie-Scott. In January 2018, Ms. Bosley wrote Donegal a check in the amount of $1,442.67 for these items. Mr. Healy explained that, although the building was in the process of being sold to Mr. Platt when he entered into the agreement with Ms. Bosley, Donegal had made an oral agreement with Mr. Platt that it would "be responsible for the Victoria and Albert situation."

When the court questioned Mr. Healy as to why Donegal needed Christie-Scott out in such a hurry since they were still paying rent, he testified as follows:

> The hurry was[,] as far as the buyer was concerned . . . . was I want to have control over this space. It's not a money issue per se. I want control, all landlords want their space first and money is the other issue. But it's always I want my space. The buyer said that they would close with that circumstances being [vacant] if you will, and I said to them I'll deal with the space after we go to closing in December. And as I said, Your Honor, it

14

wasn't us that wanted to do the December closing, it was the buyer. And so, rightly or wrongly, that's what the buyer wanted and that's what we did.[11]

Mr. Healy further testified that, when Christie-Scott made a request for a second extension until February 2018, he became concerned that they were going to keep asking for extensions. He expressed concern with the assumption "that somehow, they have the right to tell me what they are going to do with my space. They are going to tell me when they are going to come[,] and they are going to go and it doesn't work that way." With regard to the property inside the space, Mr. Healy testified that he believed Donegal "had the right to everything in that salon other than the personal property of the people there" because it had a lien under the lease. He stated that, beyond Mrs. Healy's efforts to sell the items left in the salon and Ms. Bosley's sales, he had not taken any additional steps to sell the items.

As indicated, counsel for Christie-Scott, in closing argument, abandoned all claims except the conversion claim. The court then made its oral ruling.

The court found that, when the lease expired in October 2016, Christie-Scott became a month-to-month tenant pursuant to Md. Code Ann., Real Prop. Article ("RP") § 8-402 (Repl. Vol. 2015), and it was entitled to "one month notice to quit." It further found that, because Donegal invoiced Christie-Scott for the rent at the same rate as before the lease expired, and Christie-Scott paid that amount, Christie-Scott stayed on the property as a tenant-at-will. After Christie-Scott notified Donegal in June 2017 that it would not be

---

[11] This sale was completed in December 2017.

renewing the lease, Donegal notified Christie-Scott that it was a "tenant holding over" and demanded double the market rent, retroactive to November 1, 2016.

The court found that, although Donegal was not authorized to make the double rent retroactive, Christie-Scott owed Donegal double rent for August, September, October, and one-fifth of November. Because Christie-Scott paid only the prior rent amount for August through October, the court found that Christie-Scott was in default for not making full payment of rent. It found, calculating the extra rent owed, plus unpaid common area maintenance fees ($9,602.14) and real-estate taxes ($1,428.37), that for the purposes of Donegal's counterclaim, Christie-Scott owed Donegal $43,304.91.

The court ruled that, due to Christie-Scott's default, Donegal had several options under the lease. Pursuant to Section 24A(a), Donegal could terminate the lease, and if Christie-Scott failed to immediately surrender, Donegal could enter the premises and remove Christie-Scott. The court found that did not happen because the lease had already terminated and there was no 30-day notice to quit the holdover tenancy.

Pursuant to Section 24A(c), Donegal was permitted to perfect and enforce a lien on the personal property and fixtures inside the salon and sell the items at a public or private sale, with the proceeds of the sale to be applied to the amount owed by Christie-Scott. The court found, however, that no sale took place. In that regard, the court noted:

> [T]here was never a sale. There wasn't an advertisement. There wasn't an auction. There wasn't a sign put up. I heard no testimony. And, in fact, Ms. Healy said it was kind of word of mouth, if anybody came and asked me, which is not really holding a sale. . . . If someone knocks on my door and says, hey, can I buy this, that's not exactly a sale. So I don't think it was commercially reasonable. He had the right to the lien, but I don't think that he perfected and enforced it because what he did was lock up the property.

16

The court found that Donegal took possession of the property "without legal right under the lease to do so." Donegal did not sell the property or make any provision to return the property to Christie-Scott, but rather, Donegal "just plain kept it." Based on these circumstances, the court determined that Donegal was liable for conversion because it had "exercised control and possession over property" that belonged to Christie-Scott, and "it did not have a legal right to do so."

With respect to damages on the conversion count, the court acknowledged that there had been "a lot of problems with the proof of damages in this case." The court ultimately looked at the February 2018 inventory list prepared by Donegal's consultant, i.e., Plaintiff's Exhibit 24, listing the fair market value of the furniture, fixtures, office equipment and supplies as $32,645.11.[12] Deducting $6,623.48 for items sold by Donegal after the lock out, the court found that the fair market value of these items was $26,021.63.

Addressing the retail products inside the salon, the court accepted the retail value of the items set forth in Plaintiff's Exhibit 5: $113,917.24. It stated that the actual damages to Christie-Scott were likely "far more than that amount," but due to "numerous problems of proof" that "could not be overcome," that was the amount of damages that the court found.

---

[12] The court stated that "one of the difficulties" in calculating these damages was that Christie-Scott intended to move some of the items into the new space and to replace others, and it was unclear "which of the old furniture and fixtures were staying and which was going." Nonetheless, the court used the figures on the inventory list as the fair market value of these items.

17

Adding the value of the retail goods ($113,917.24) to the value of the furniture, fixtures, and equipment ($26,021.63) resulted in damages in the amount of $139,938.87. The court then offset the damages owed to Donegal for back-rent, real estate taxes, and CAM, which it calculated to be $43,304.91, to reach a compensatory damage award for Christie-Scott of $96,633.96.

The court next turned to Christie-Scott's punitive damages request. It found "by clear and convincing evidence that Donegal acted with the intent to injure" Christie-Scott. The court noted that there was a District Court case scheduled for three days later that would have covered their damages. The court stated:

> Mr. Healy testified it's not about the money. The trigger was when Plaintiff advised that the space wouldn't be ready in November. The underlying principle is that they don't have the right to tell me what I'm going to do with my space. And there was also a management company who strongly advised the Defendant against taking the action that it did. There was never a notice to quit. There was never a notice that the month-to-month tenancy was terminated. The Plaintiffs were relying on the fact that there would be litigation and had there been a judgment for repossession in the District Court, they would have had a very small amount of time but time to pack up and leave.

> Mr. Healy is a businessman. He has wonderful credentials. He's got a Law Degree. He's been owning business property in Howard County for many, many years. . . . Mr. Healy knew and understood that taking the furniture and fixtures, the inventory and potentially all of the stylists would destroy Victoria and Albert, Christie[-]Scott. It would shut them down. There was never a demand for money to release the goods. There was this attempt to, and I can infer from the fact that Ms. Bosley knew to find a place to cut hair the day after the lock-out, that this discussion may have been going on even prior to the lock-out, that there were discussions between Ms. Bosley and between the Healys with respect to her taking over, basically taking over, Victoria and Albert business with her own name on it. This was done knowing the devastation that it would cause to the Plaintiffs.

18

The court awarded Christie-Scott $1,000,000 in punitive damages. The court subsequently issued an Order, which was entered on May 3, 2019. In the Order, the court made supplemental findings, including that Donegal was not liable for trespass because the lease allowed it to reenter and take possession of the property because Christie-Scott was in default. The order further stated:

> The Court finds that Defendant's actions in taking and keeping the Plaintiff's property without a legal right constituted conversion. Detailed findings were placed on the record. Actual and punitive damages are awarded to Plaintiff for Defendant's conversion.
>
> With regard to the punitive damages, the Court finds, based on the testimony of John Healy, that Donegal Associates is a commercial landlord. It owned the building in which Plaintiff had been a tenant. This was adjacent to the Howard County General Hospital, and was a location with a nice central common courtyard area with plants and seating. There were a number of long term tenants in the building. Mr. Healy testified that the business lost $500,000.00 on the salon space alone, leading the Court to find that the building sold for a substantial sale price, as the salon was one of many rental spaces. Mr. Healy also testified that the owners of Donegal did not take income from the proceeds of the rents for the building for many years, instead applying the funds to the mortgage. The building was sold in December [2017]. In order to deter the Defendant and others from similar conduct in the future, the punitive damage award would have to be substantial. The One Million Dollar punitive award will serve as such a deterrent while not financially destroying the Defendant.
>
> In addition, in setting the amount of the punitive damages, the Court takes into account the devastating impact Defendant's actions had on Plaintiff. Although Plaintiff struggled to prove the amount of damages, the Court finds that Defendant locking Plaintiff out of its space, with no access to its property and papers inside, without notice, caused 14 stylists, many of them long time employees with client followings, to leave employment with Plaintiff, significantly reduced its income as well as its ability to earn income in the future. In addition, Plaintiff was in a position where it had to replace all of its furniture, office goods, accessories and inventory necessary to run a salon business. The Court finds by clear and convincing evidence that Defendant locked the Plaintiff out with the purpose and expectation of severely damaging Plaintiff's business, as detailed on the record. The

19

Court's assessment of punitive damages was proportionate to the wrongfulness of its conduct and its ability to pay.

This appeal followed.

## DISCUSSION

Donegal began its brief by challenging the punitive and compensatory damages awards. We will begin with the issue of whether the court properly found conversion because, if there was no conversion, the challenge to the damages is moot.

Donegal contends that the circuit court erred in finding that it was liable for conversion of Christie-Scott's property. It asserts that there are two types of conversion, direct and constructive, neither of which was supported by the evidence. Donegal argues that there was no direct conversion because Donegal had a possessory interest in the property. In that regard, it notes that the court found, consistent with the terms of the lease, that Donegal had a right to a lien on the goods. It further argues that there was no constructive conversion because Christie-Scott made no showing that it had demanded the return of the goods and the demand was refused.

Christie-Scott argues that the trial court properly found that Donegal converted its inventory. It asserts that the evidence supported the court's finding of a direct conversion because Donegal took possession of Christie-Scott's property "without right under the lease to do so." It argues that Donegal failed to provide 30-day notice to vacate before repossessing the premises, and the self-help repossession was improper because it was not peaceful. Christie-Scott asserts that, even if the circuit court improperly found a direct

20

conversion in this case, a conversion occurred because Donegal "failed to dispose of Christie-Scott's property in a reasonable manner."

The Court of Appeals has described the tort of conversion as follows:

> Conversion is an intentional tort, consisting of two elements, a physical act combined with a certain state of mind. The physical act can be summarized as "any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it." *Allied Investment Corp. v. Jasen*, 354 Md. 547, 560, 731 A.2d 957, 963 (1999) (quoting *Interstate Ins. Co. v. Logan*, 205 Md. 583, 588–89, 109 A.2d 904, 907 (1954)). This act of ownership for conversion can occur either by initially acquiring the property or by retaining it longer than the rightful possessor permits.

*Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 261–62 (2004).

Conversion can be either direct or constructive. *K & K Management, Inc. v. Lee*, 316 Md. 137, 173–74 (1989). "Constructive conversion is predicated on possession by the defendant that was initially lawful or rightful." *Id.* at 173. *Accord Parlett Ford, Inc. v. Sosslau*, 19 Md. App. 320, 322–23 (1973), *cert. denied*, 271 Md. 744 (1974). After rightful possession, however, conversion may occur if there is "a wrongful detention of the goods and refusal to deliver them after due demand." *Mattingly v. Mattingly*, 150 Md. 671, 674 (1926). To establish a constructive conversion, "it is necessary to show a demand for the return of the chattel by the rightful owner, and a refusal by the wrongful holder, or some assertion of an adversary right by the holder." *Durst v. Durst*, 225 Md. 175, 179 (1961). In a direct conversion, by contrast, "the taking is considered to be *per se* tortious and the requirements of demand and refusal do not apply." *K & K Management, Inc.*, 316 Md. at 174.

Here, the circuit court found that there was a direct conversion. It stated: "I really didn't have to struggle with whether it was a constructive conversion. It was a conversion that without right under the lease to do so, the landlord took possession of the [Christie-Scott's] property."

In reviewing the circuit court's findings, the parties correctly note that we review factual findings subject to clear error review. *See Plank v. Cherneski*, 469 Md. 548, 568 (2020). The ultimate conclusion regarding whether Donegal converted Christie-Scott's property, however, is a legal finding that this Court reviews de novo. *See Credible Behavioral Health, Inc. v. Johnson*, 466 Md. 380, 392 (2019) (appellate court reviews legal conclusions de novo); *Midwestern Helicopter, LLC v. Coolbaugh*, 839 N.W.2d 167, 216–17 (Wis. 2013) ("The trial court's decision that the facts amounted to conversion is a question of law which [the appellate court] review[s] de novo."), *petition for review denied*, 846 N.W.2d 15 (2014).

In determining whether there was a direct conversion here, we note that a commercial landlord is permitted to resort to self-help to repossess premises and property within the premises when a tenant is in breach of a lease that authorizes that remedy. *K & K Management, Inc.*, 316 Md. at 167–68. In *K & K Management, Inc.*, the owners of a motel had a lease with the Lees to operate the motel's restaurant. *Id.* at 162. The owners took possession of the restaurant by changing the locks without notice. *Id.* The Court found that the Lees' right "to occupy the premises or receive notice of termination rested on the [lease] Agreement." *Id.* at 167–68. Because the repossession of the restaurant

22

premises was not permitted by the Agreement, the landlord's action was determined to be unlawful. *Id.* at 168–69, 171–74.

Similarly, the propriety of the landlord's action in exercising possession of the property within the restaurant turned on the terms of the Agreement. *Id*. at 172. Because the jury construed the terms of the ambiguous Agreement as giving the landlord no possessory interest in the property, the landlord was liable for a direct conversion. *Id*. at 174.

The Court went on to comment, however, on the right to self-help in a commercial lease, as follows:

> We do not encourage resort to self-help and, for all of the practical reasons which the instant action makes abundantly clear, the Bar usually counsels against it. *See* Maryland Institute for Continuing Professional Education of Lawyers, Inc., *Commercial Leases* 257, 259 (1987). Nevertheless, self-help is not a prohibited means of acquiring repossession of premises upon termination of a commercial lease, so long as the repossession can be effected peacefully.

*Id.* at 178. *Accord Nicholson Air Servs., Inc. v. Bd. of Cty. Com'rs of Allegany Cty.*, 120 Md. App. 47, 79 (1998) (rejecting the argument that a commercial landlord may not resort to self-help to repossess premises when "the tenant is in breach of a commercial lease that expressly authorizes such a remedy").

Based on this case law, a commercial landlord is permitted, although it is not encouraged, to resort to self-help to repossess premises and property within the premises in the following circumstances: (1) the tenant is in breach of a lease; (2) that authorizes the remedy of repossession; and (3) the repossession can be done peacefully. *See K & K Management Inc.*, 316 Md. at 178; *Nicholson Air Servs., Inc.*, 120 Md. App. at 79–82; Md.

23

Code Ann., Comm. Law Article § 9-609 (Repl. Vol. 2013) (After default, a secured party may take possession of collateral without judicial process "if it proceeds without a breach of the peace."). As explained below, those circumstances were satisfied in this case.

First, the circuit court found that Christie-Scott was in default of the lease because it did not pay the full amount of rent that Donegal was charging it as a holdover tenant.[13] This finding was supported by the record, and it was not clearly erroneous.

Second, we look to the terms of the lease to determine if it authorized Donegal to take possession of the property inside the salon in the event of breach. In *K & K Management, Inc.*, 316 Md. at 174, the Court held that, where the landlord locked out the restaurant operators and retained the property inside, the conversion was direct because the jury found no possessory interest in the property under the agreement that was "at best ambiguous as to [landlord's] ownership interest in the listed personalty."

Here, by contrast, Section 24A of the lease provided that, if Christie-Scott failed to pay rent, or additional rent, Donegal was entitled to "[p]erfect and otherwise enforce a lien" on "all personal property, fixtures, and trade fixtures" in the salon. The lease provided that Christie-Scott agreed that Donegal had such a lien and could sell its property at a public or

---

[13] Although Christie-Scott was a holdover tenant at the time of the lockout, the parties were still bound by the terms of the original lease because the lease explicitly provided that, if Christie-Scott becomes a tenant-at-will or holdover tenant, "all other covenants of this Lease shall remain in full force and effect." *See also Straley v. Osborne*, 262 Md. 514, 520 (1971) (A "holdover tenancy is on all the terms and conditions of the original lease . . . unless a contrary intention is shown."); *Donnelly Advertising Corp. of Md. v. Flaccomio*, 216 Md. 113, 121 (1958) (When a tenant holds over, the parties continue to be bound by the covenants and provisions of the original lease.).

private sale without notice. Accordingly, the trial court properly found that, pursuant to Section 24A, Donegal had a lien on the property inside the premises.

Third, the repossession must be done peacefully.[14] A commercial landlord is required to "avoid a confrontation possibly leading to violence." *K & K Management, Inc.*, 316 Md. at 179. Self-help repossessions must be "conducted at a reasonable time and in a reasonable manner." *Droge v. AAA Two Star Towing, Inc.*, 468 P.3d 862, 874 (Nev. 2020). A "breach of the peace" for repossession actions has been described as conduct that "incites or is likely to incite immediate public turbulence, or which leads to or is likely to lead to an immediate loss of public order and tranquility. Violent conduct is not a necessary element. The probability of violence at the time of or immediately prior to the repossession is sufficient." *Pantogi-Cahue v. Ford Motor Credit Co.*, 872 N.E.2d 1039, 1044 (Ill. App. Ct. 2007) (quoting *Chrysler Credit Corp. v. Koontz*, 661 N.E.2d 1171, 1173 (Ill. App. Ct. 1996)).

---

[14] Christie-Scott also contends that there was a direct conversion here because, pursuant to Md. Code Ann., Real Prop. Article ("RP") § 8-402(b)(1)(i) (Repl. Vol. 2015), Donegal was required to, but did not, give a 30-day notice to vacate before repossessing the premises. This contention is without merit. Although RP § 8-402(b)(1)(i) provides for a landlord to give a 30-day notice to a tenant to repossess the premises, RP § 8-402(a)(4) also provides that this statute does not limit other remedies "under the lease or under applicable law." Here, the parties' lease provided that, when the tenant defaults, Donegal may terminate the lease, enter upon the premises, and "enforce a lien" on all property in the salon. Thus, based on Christie-Scott's breach of the lease, Donegal was not required to give a 30-day notice to Christie-Scott before repossessing the premises or the property inside. Moreover, the Court of Appeals has explained that "notice is not required to exercise peaceable self-help." *Nickens*, 429 Md. at 72–73. *See also K & K Management, Inc. v. Lee*, 316 Md. 137, 178 (1989) (Reentry without notice, pursuant to the terms of the lease, is "entirely compatible with a desire to avoid a confrontation possibly leading to violence.").

25

Here, Donegal intentionally chose to repossess the salon on a Monday, a day that the salon would be closed. Although one employee was present, there was no confrontation. Donegal announced that they were there to execute a "peaceful eviction," and the employee present was told to leave and allowed to take her personal belongings, which she did without protest. Under these circumstances, there was no factual question generated regarding a breach of the peace. Accordingly, we reject Christie-Scott's argument that the repossession was not peaceful.

Because the initial taking of the property inside the salon was not tortious or wrongful, but rather, it was conducted peacefully and in accordance with the lease, we hold that there was no direct conversion. We thus address whether there was a constructive conversion.

The circuit court's ultimate conclusion that Donegal was liable for conversion appeared to be based on the fact that Donegal did not sell the property, as provided for in the lease, but rather, Donegal "just plain kept it." To be sure, a landlord exercising the right to the remedy of self-help must act reasonably in disposing of property. *Nickens v. Mount Vernon Realty Group, LLC*, 429 Md. 53, 79 (2012), *superseded by statute,* Md. Code Ann., Real Prop. Article § 7-113.[15] *See Industrial Technologies, Inc. v. Jacobs Bank*,

---

[15] After *Nickens v. Mount Vernon Realty Group, LLC*, 429 Md. 53 (2012), was decided, the General Assembly enacted Md. Code Ann., Real Prop. Article § 7-113, *see* 2013 Md. Laws, Ch. 514 (S.B. 642, eff. June 1, 2013). This statute "significantly limited the scope of self-help in situations involving residential properties." *Wheeling v. Selene Finance LP*, 246 Md. App. 255, 271 (2020), *cert. granted*, 2020 WL 6059796 (Sept. 14, 2020). This statute does not apply to this case because we are dealing with a commercial lease.

26

872 So.2d 819 (Ala. 2003) ("Even where the initial taking by the defendant was not tortious, the *retention* of the personalty after demand for its return" may result in a conversion claim.) (cleaned up).

As counsel for Christie-Scott acknowledged at oral argument, however, a party claiming constructive conversion must show a demand and refusal. *See Yost v. Early*, 87 Md. App. 364, 388 ("In order to establish a constructive conversion, . . . it is necessary to show a demand for the return of the chattel by the rightful owner, and a refusal by the wrongful holder, or some assertion of an adversary right by the holder.") (quoting *Durst*, 225 Md. at 179), *cert. denied*, 324 Md. 123 (1991); *Collins v. Trammel*, 911 S.W.2d 635, 638 (Mo. Ct. App. 1995) (Plaintiff's conversion claim failed because the initial taking was lawful, and plaintiff failed to show that demand and refusal was made.).

In its brief, Christie-Scott argued that it did make a demand, citing to its complaint in this case, which raised the claim of conversion. We hold, however, as have other courts addressing the issue, that the demand and refusal required to establish constructive conversion must be made prior to filing suit for conversion. *See Stevens v. Interactive Financial Advisors, Inc.*, 830 F.3d 735, 741–42 (7th Cir. 2016) (The filing of a conversion lawsuit does not constitute a demand; "a pre-lawsuit demand is necessary to sustain a conversion claim."); *Mayfield Smithson Enterprises v. Com-Quip, Inc.*, 896 P.2d 1156, 1163 (N.M. 1995) ("[A]n action for conversion requires . . . a demand for return of the property prior to filing the complaint."). *See also Peasley Transfer & Storage Co. v. Smith*, 979 P.2d 605, 617 (Idaho 1999) (Legal proceeding to release property seized does not constitute "a demand for the return of property for purposes of a conversion claim.").

27

Christie-Scott also argues that its motion for a temporary restraining order constituted a demand. For the same reasons as our holding that the complaint did not constitute a demand, we hold that the motion did not constitute a demand sufficient to sustain a conversion claim. Moreover, Christie-Scott's motion was not a sufficient demand because it requested that Donegal restore its possession of the premises, not the personalty inside. *See Mattingly*, 150 Md. at 675 (A demand pursuant to this requirement "should be so definite as to apprise the defendant with reasonable exactness what goods are meant."). Thus, at the time of trial here, Christie-Scott had failed to meet the requirement of a demand and refusal to show a constructive conversion.

We hold that the circuit court erred in finding that Donegal was liable for conversion of Christie-Scott's property, and we reverse the circuit court's finding in this regard. It follows that we also reverse the compensatory and punitive damage awards to Christie-Scott.

We note, however, that the circuit court's May 3, 2019, Order required Donegal to pay $96,633.96. This award resulted from an offset of $43,304.91 for the amount Christie-Scott owed to Donegal on its counterclaim for breach of the lease against the damages to Christie-Scott of $139,938.87. Christie-Scott did not file a cross-appeal challenging this finding regarding Donegal's counterclaim, and therefore, it is not before us on appeal. As a result, we remand to the circuit court to revise its final judgment in accordance with this opinion.

**JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY IN FAVOR OF CHRISTIE-SCOTT ON ITS COMPLAINT AGAINST DONEGAL REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLANT.**[16]

---

[16] Although we reverse the decision of the circuit court, we exercise our discretion to impose costs on Donegal.